THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| MCKENNA ADVISORS LLC,<br><br>Petitioner,<br><br>v.<br><br>PGA TOUR, INC.,<br><br>Respondent. | Miscellaneous Action No. 1:23mc8 |

### MEMORANDUM IN SUPPORT OF MCKENNA ADVISORS LLC'S MOTION TO QUASH THIRD PARTY SUBPOENA

Pursuant to Federal Rule of Civil Procedure 45(d), non-party McKenna Advisors LLC ("McKenna") moves this Court for an Order quashing the subpoena Defendant PGA Tour, Inc. ("PGA") served on McKenna seeking discovery in an action pending in the United States District Court for the Northern District of California.

The PGA served its subpoena to McKenna on December 28, 2022.  *See* Ex. A to Declaration of Cailyn Knapp ("Knapp Dec.").  After months of efforts to meet-and-confer, the PGA subpoena still includes sixteen (16) requests for documents and thirteen (13) deposition specifications,[1] many of which bear no material relevance to the core allegations in the antitrust litigation between the PGA and LIV Golf, Inc. ("LIV"), and/or seek information that could just as easily be obtained from LIV itself.  The PGA has thus far refused to justify its failure to pursue this discovery it claims to need directly from LIV *before* burdening McKenna; nor has the PGA

---

[1] While McKenna is not seeking to quash the deposition through this motion, it does not concede the PGA's deposition subpoena is appropriate. McKenna assumes that resolution of this motion will provide the parties appropriate guidance on the permitted scope of discovery, if any.

engaged in any meaningful efforts to narrow the instant subpoena to seek only those materials relevant to the underlying litigation and not available elsewhere.

McKenna is not a party to the underlying Northern District of California litigation, nor is it ever mentioned in the Amended Complaint or the PGA's Answer and Amended Counterclaims. Rather, McKenna is a small, Virginia-based consulting firm, with a handful of employees in one location in Arlington, and no offices or operations in California. Admittedly, McKenna has served as an outside consultant to LIV, engaged to conduct specific tasks for Performance 54i (the predecessor name to LIV), related to LIV's efforts to compete with the PGA. But importantly, McKenna has already agreed to produce the materials that it generated in that role that bear on the claims in the underlying LIV-PGA dispute. Those core consulting materials regarding the PGA player contracts, compensation or solicitation are *not* at issue in this motion. Rather, this motion is necessitated by the PGA's insistence on conducting a fishing expedition into *unrelated* work that McKenna may have performed for LIV (or other entities entirely), including primarily topics that the PGA has described as "public affairs," "government investigations" and "opposition research." Accordingly, for the reasons set forth below, McKenna respectfully submits that the PGA's subpoena should be quashed pursuant to Fed. R. Civ. P. 45(d) as overbroad and unduly burdensome.

**FACTUAL BACKGROUND**

McKenna is a small, nine-employee consulting company headquartered in Arlington, Virginia. In October 2021, McKenna was hired by Performance 54i to provide consulting services in developing and implementing strategies pursuant to an agreed upon work order. *See* Knapp Dec. Ex. C. Over the course of that engagement, McKenna has provided various consulting

services and research relating to professional golf, and generally advised Performance 54i on a strategic approach to its efforts to advance competition in the sport. *See id.*

As stated above, McKenna is not a party to the underlying antitrust case pending in the Northern District of California: that case is between certain professional golfers, LIV and the PGA. It began on August 3, 2022, when certain professional golfers[2] filed a complaint against the PGA for the monopolization of professional golf after the PGA threatened a lifetime ban on players who played in any LIV Golf event. *See* Knapp Dec. Ex. D (Compl. ¶ 3). On August 26, 2022, LIV joined the lawsuit and, along with seven professional golfers,[3] filed an amended complaint, adding a claim for tortious interference with LIV's contractual relationships. Knapp Dec. Ex. E (Am. Compl. ¶ 379). Notably, the gist of the allegations in that case concern the PGA's efforts to prevent LIV's competitive entry by enforcing certain tour regulations that effectively tied-up players and prevented them from playing on other golf tours. *Id.* On September 28, 2022, the PGA answered and counterclaimed against LIV, alleging LIV tortiously interfered with contracts between the PGA and seven specific golfers. *See* Knapp Dec. Ex. F (PGA Am. Countercl. ¶ 56).[4] Not surprisingly, McKenna was never mentioned in either LIV's complaint or in PGA's counterclaim.[5] *See generally id.*

On December 28, 2022, the PGA Tour served a subpoena on McKenna that included thirteen (13) deposition topics and twenty-one (21) production requests. Knapp Dec. Ex. A. On

---

[2] The initial complaint named the following plaintiffs: Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Abraham Ancer, Carlos Ortiz, Ian Poulter, Pat Perez, Jason Kokrak, and Peter Uihlein. Ex. D (PGA Complaint).
[3] The individual plaintiffs in the amended complaint are Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, and Peter Uihlein.
[4] The PGA's counterclaims assert interference with the PGA's relationship with Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, and Peter Uihlein (the "seven golfers").
[5] On February 23, 2023, the PGA filed an amended counterclaim against LIV, which was filed after the PGA served its subpoena on McKenna. The amended counterclaim is operative, with substance that remains the same for all purposes relevant to this motion. *See* Ex. F. (PGA Am. Countercl.).

February 7, 2023, McKenna responded by articulating the basis for several objections to the PGA subpoena, including objections of relevance, overbreadth, burden, and privilege. *See* Knapp Ex. G (Feb. 7, 2023, McKenna Letter to PGA). As detailed therein, the PGA's subpoena demanded documents and communications that far exceeded the scope of claims in the underlying litigation, including, for example, requests relating to McKenna's relationship with certain non-parties, such as Golf Saudi, that had no bearing on the allegations in the underlying litigation; topics with no relation to the present case such as the "Kingdom of Saudi Arabia's human rights record;" and requests that implicated important constitutional rights, such as "all communications with any elected or unelected government officials or their staff." *See* Knapp Dec. Ex. B at Req. for Prod. ("RFPs") Nos. 1, 7, 13-14, 17.

On February 13, 2023, McKenna and PGA counsel met to discuss the parameters of that subpoena. At this meeting, McKenna counsel advised that the PGA's demand for documents—including documents relating to "[a]ll communications with any elected or unelected government officials," documents regarding McKenna's relationship with the "Saudi PIF, Golf Saudi, and/or the Kingdom of Saudi," and any of its requests related to the politically charged issues involving Saudi Arabia (issues wholly unrelated to McKenna's consulting projects)—went far beyond the claims in the litigation, and thus, exceeded the scope of permissible discovery to a non-party. It also advised that the PGA's overreach was especially egregious where the PGA could just as easily get any potentially relevant documents from LIV itself. *See* Knapp Dec. Ex. B at RFPs Nos. 1, 14. From the outset of these negotiations, McKenna made clear that it *would agree* to produce certain non-privileged documents that were actually relevant to the claims or defenses in the litigation; namely documents regarding the recruitment of the seven players named in the PGA's counterclaims. The PGA rejected this offer.

On February 24, 2023, the parties met again by video conference, where McKenna again offered to produce documents responsive to the requests related to the recruitment of the players referenced in the counterclaims. McKenna also informed the PGA that the "work order" the PGA cited to multiple times in its subpoena was not the operative McKenna engagement and that McKenna would produce the correct work order. On March 10, 2023, Counsel for the PGA amended its subpoena—removing five (5) out of the twenty-one (21) initial requests it made to McKenna.[6] *See* Knapp Dec. Ex. B. On March 15, 2023, McKenna reiterated its offer to produce responsive, non-privileged documents prepared pursuant to the operative work order that were relevant to the PGA's alleged efforts to monopolize professional golf, as well as to LIV's alleged tortious interference with player contracts. To the extent that the PGA insisted on a broader, more attenuated scope of relevance, however, McKenna urged PGA to seek those documents from LIV itself, as the party to the litigation. In addition, McKenna reiterated its belief that the PGA had failed to provide *any explanation* for why McKenna's communications with elected and unelected government officials were relevant to the underlying dispute, as Rules 45 and 26 require. On March 30, 2023, in an email response to McKenna, the PGA refused this offer and refused to make additional modifications and removals to its subpoena at that time.

Finally, on April 10, 2023, and in follow-up correspondence on April 11-12, counsel for the parties met and conferred by video conference to narrow the areas of disagreement but were unable to resolve the particular issues now before this Court that go far beyond the central issues of player recruitment, contracts and compensation. *See* Knapp Dec. Ex. J.

---

[6] In its amended subpoena to McKenna, the PGA modified RFP 13 and removed RFPs 15, 18-21, refusing to make any modifications or additional removals to the other sixteen RFPs at that time. *See* Knapp Dec. Ex. B.

5

## JURISDICTION

McKenna is a limited liability Virginia corporation, headquartered in Arlington, Virginia.[7] McKenna is before this Court because the PGA seeks discovery from McKenna in this district. *See* Fed. R. Civ. P. 45(d)(3)(A) ("[T]he court for the district where compliance is required must quash or modify [the] subpoena").[8]

## LEGAL STANDARD

Discovery is limited to information regarding issues that are "not privileged" and "relevant to the *claim or defense* of any party." Fed. R. Civ. P. 26(b)(1) (emphasis added). Under the federal rules, a party issuing a subpoena "must [also] take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Should a party violate its obligation to minimize the burden, "the court for the district where compliance is required must quash or modify [the] subpoena." Fed. R. Civ. P. 45(d)(3)(A).

Parties that seek non-party discovery must meet a higher burden of justification. As the Fourth Circuit explained, this is because "[n]onparties are 'strangers' to the litigation, and since they have 'no dog in [the] fight,' they have 'a different set of expectations' from the parties themselves. Bystanders should not be drawn into the parties' dispute without some good reason, even if they have information that falls within the scope of party discovery." *Va. Dept. of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019) (citation omitted). In part, non-party subpoenas should be limited to "information that cannot be obtained from the party directly." *Id.*; *see also*

---

[7] The citizenship of an LLC is determined by the citizenship of its members. *Contreras v. Thor Norfolk Hotel, LLC*, 292 F. Supp. 2d 794, 798 (E.D. Va. 2003). All members of McKenna Advisors LLC are residents of Virginia.
[8] The PGA requested that McKenna consent to the PGA's filing a motion to compel in the Northern District of California, where the underlying litigation is pending, to maximize convenience to the PGA. McKenna declined to do so, as it would impose undue burden and expense on McKenna, and there were no "exceptional circumstances" present that warranted such a transfer under Fed. R. Civ. P. 45(f).

6

Fed. R. Civ. P. 26(b)(2)(C) (requiring that courts limit the frequency or extent of discovery if it "can be obtained from some other source that is more convenient, less burdensome, or less expensive").

Courts also apply stricter standards of relevance and proportionality when dealing with non-party discovery. While *parties* may be granted some leeway as to relevance and proportionality in their discovery from each other, "[w]hen discovery is sought from nonparties, . . . *its scope must be limited even more.*" *Jordan,* 921 F.3d at 189 (emphasis added). Courts "consider not just the relevance of information sought, but the requesting party's need for it." *Id.* "The information sought must likely (not just theoretically) have marginal benefit in litigating *important issues.*" *Id.* (emphasis added). As to the requirement of proportionality, the Fourth Circuit has reasoned that while, as under Rule 26, "the ultimate question is whether the benefits of discovery to the requesting party outweigh the burdens on the recipient," courts "*must give* the recipient's nonparty status 'special weight,' leading to an even more 'demanding and sensitive' inquiry than the one governing discovery generally." *Jordan,* 921 F.3d at 189. (citations omitted; emphasis added).

Finally, with respect to the PGA subpoena's request for McKenna's communications with governmental officials, in particular, the relevancy of that discovery should be adjudged under a heightened standard because the material sought directly impinges upon constitutionally protected First Amendment activity, including the right to petition the government. Because court-ordered discovery derives from the government's authority to compel, an order to reveal protected speech runs the risk of chilling protected conduct. *Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987) ("Although the First Amendment does not normally restrict the actions of purely private individuals, the amendment may be applicable in the context of discovery orders, even if all of the

7

y
z

litigants are private entities."). Courts must be careful to limit any overbroad discovery regarding protected petitioning conduct given both First Amendment concerns and the immunity accorded to such conduct by the *Noerr-Pennington* doctrine.[9] As one presiding court weighing the public interest involved in an antitrust case brought by the government explained, "the first amendment values inherent in *Noerr*-protected activities demanded that the chilling effect of forced disclosure be balanced against the [ ] interest in acquiring the information." *See Australia/Eastern U.S.A. Shipping Conference v. United States*, 537 F. Supp. 807, 808 (D.D.C. 1982), *vacated as moot* 1986 WL 1165605 (D.C. Cir. 1986).

## ARGUMENT

### I. The Court Should Quash or Modify the PGA's Subpoena as Improper Non-Party Discovery

The PGA's subpoena is unduly burdensome, improper non-party discovery because: (1) the requests seek information that is irrelevant to the claims and defenses in the underlying case; (2) the requests are overly broad and disproportionate to the needs of the underlying litigation; and (3) the information and documents sought are more easily obtained from other, more logical sources. *See Jordan*, 921 F.3d at 189 (citation omitted) ("A party may seek to quash or modify a subpoena on grounds of irrelevance or overbreadth . . . because either irrelevance or overbreadth necessarily establishes undue burden").

Relevance under Rules 26 and 45 is defined by the claims and defenses in the underlying litigation. Here, LIV alleges that the PGA unlawfully monopolized professional golf and sought to prevent LIV's competitive entry by enforcing certain tour restrictions that effectively locked-up the players and prevented them from playing on other golf tours. *See* Knapp Dec. Ex. E ¶ 10

---

[9] *Ottensmeyer v. Chesapeake & Potomac Tele. Co.,* 756 F.2d 986, 993 (4th Cir. 1985) ("[P]olicies behind the *Noerr-Pennington* doctrine include preserving an individual's first amendment right to petition government officials.").

8

("The PGA Tour has been clear since the threat of competitive entry emerged that its most powerful weapon to defeat competition is to target its members . . . to prevent them from playing on a competing tour."); *id.* ¶ 11 ("The Tour set out to destroy competition in its infancy by doing everything in its power to lock up its members (including Plaintiffs) and deny them the opportunity for true sustained competition for their services."). Nothing in LIV's claims is based upon any work that McKenna may have performed LIV (or Performance54i) under the work order. Similarly, with the arguable exception of player recruitment (which materials McKenna has agreed to produce), the PGA's counterclaims bear little relation to any work McKenna may have done on behalf of LIV. Rather, the PGA's claims are based on allegations that LIV interfered with the contracts of seven of its players (those who chose to leave the PGA Tour and sue the PGA). Thus, the issues in the underlying suit primarily concern two things: (1) monopolization, which involves proving monopoly power and exclusionary conduct by the PGA in a relevant market, and (2) tortious interference, which involves intentional acts designed to induce a breach of contract. *See E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 456 (E.D. Va. 2009) (providing elements of monopolization under Section 2 of the Sherman Act); *see San Miguel v. HP Inc.*, 317 F. Supp. 3d 1075, 1094 (N.D. Cal. 2018) (providing elements of tortious interference under California law).

Despite the clear contours of the underlying litigation, most of the PGA's requests seek documents from McKenna that on their face would have no bearing whatsoever on the allegations of monopolization or tortious interference, or any defenses thereto. Indeed, McKenna already agreed to produce its communications with LIV and certain other third parties related to player contracts, compensation or recruitment. *See* Knapp Dec. Ex. J. PGA, however, insists on McKenna's search for and production of documents far from the claims and defenses in that case,

9

including whole categories of requests that it has characterized as "public affairs campaigns," "government investigations," and "opposition research." *Id.*

Moreover, the vast majority of the PGA's requests seek information that is not only irrelevant, but would be plainly inadmissible in any court, thus failing a key limitation on non-party discovery. For example, the subpoena requests "[a]ll documents and communications related to" the Kingdom of Saudi Arabia's human rights record, the Saudi PIF or third parties, Golf Saudi, and communications with any elected or unelected government officials. *See, e.g.*, Knapp Dec. Ex. B at RFPs 1, 3, 7, 13-17. Again, such requests have no bearing on the PGA's alleged monopolization of professional golf or LIV's alleged tortious interference with the seven golfers at issue.[10] And, despite some minor modifications to the subpoena, PGA's proposed search terms still reveal its intentions to use discovery in an attempt to tarnish the reputation of LIV or those who do business with it including: "khashoggi OR khasogi OR kashhogi OR kashoggi OR "9/11" OR terror* OR "September 11" OR sponsor*." Knapp Dec. Ex. H.

Still other requests in the PGA's subpoena seek documents or testimony regarding communications between one non-party (McKenna) and other non-parties regarding topics that likewise have nothing to do with the litigation. For example:

**RFP No. 13**: "[a]ll documents and communications related to discussions with . . . Saudi PIF or third parties working on behalf of LIV or Saudi PIF relating to the PGA TOUR;"

**RFP No. 14**: "[a]ll communications with any elected or unelected government officials or their staff, professional golfers, agents, sports media, sponsors of professional golf, equipment manufacturers, venue or course owners, or golf trade associations regarding the PGA TOUR, LIV, LIV's efforts to establish a competing professional golf tour, Saudi PIF, Golf Saudi, the Kingdom of Saudi Arabia, the Kingdom of Saudi Arabia's human rights record, the DOJ's investigation of the PGA TOUR, the allegations in this litigation, or this litigation;" and

---

[10] Although the standard of relevance is defined by the claims and defenses in the underlying lawsuit, and not the scope of work between McKenna and Performance54i, these requests also go well-beyond the scope of that engagement.

10

>**RFP No. 17:** "[a]ll documents and communications related to any media, social media, or public affairs campaign you have conducted involving professional golfers."

Not surprisingly, PGA has not and cannot explain how McKenna's (not LIV's) interactions, if any, with Saudi PIF, Golf Saudi, the Kingdom of Saudi Arabia, and other non-party entities, are relevant to the monopolization or tortious interference claims at issue. *See, e.g.*, Knapp Dec. Ex. B. at RFP Nos. 1, 13, 14. Rather, these requests seem designed to harass and distract from the claims at issue by going after companies that do business with LIV, or more generally, to support the idea that LIV and the PGA dislike each other and/or have taken actions to court public opinion to their viewpoints. *See, e.g.*, *Bush Dev. Corp. v. Harbour Place Assoc.*, 632 F. Supp. 1359, 1364 (E.D. Va. 1986) (stating if "it is clear 'that the evidence sought can have no possible bearing on the issues,'" then the subpoena may be quashed) (citations omitted). That general desire to sully an opponent, of course, is not a "need" regarding "important issues" in the litigation. *Jordan,* 921 F.3d at 189.

Finally, the PGA has made minimal efforts to tailor its requests so as to limit the burden on a non-party: ***fourteen*** of the PGA's sixteen requests improperly seek "[a]ll" documents, communications, or work "related to" general categories. *See* Knapp Dec. Ex. A. at Dep. Topic Nos. 3; *see* Ex. B. at RFP Nos. 3–17. Not only do many of these requests seek wholly-irrelevant information, as discussed above, but such requests for "any" and "all" documents "relating" to broad categories of information are a telltale indicia of overly broad requests, that, on its own, provides sufficient basis to quash non-party discovery. *See. e.g.*, *United States Sec. & Exch. Comm'n v. Ahmed*, No. 3:15CV675 (JBA), 2018 WL 1541902, at *2 (D. Conn. Mar. 29, 2018) ("Courts have often found that such blanket requests are overbroad and impermissible."); *see also Gopher Media, LLC v. Spain,* No.: 3:19-cv-02280-CAB-KSC, 2020 WL 6741675, at *5 (S.D. Cal. Nov. 17, 2020) ("As a rule, requests for 'any and all' documents or communications (or testimony

11

about those materials) are facially overbroad.").[11] For all of these reasons, the subpoena should be quashed in its entirety for failure to satisfy the strictures of Rule 45.

**II. The Court Should Quash the PGA's Subpoena Unless and Until It Can Demonstrate the Information Cannot Be Obtained from A Party to the Litigation**

Whether or not the PGA can prevail upon this Court for a scope of discovery in a golf industry antitrust case that is expansive enough to capture references to "Khashoggi" or "September 11," it remains the case that much, if not all, of the information the PGA seeks can, and should, be obtained from LIV itself without the need to burden a non-party. *Jordan*, 921 F.3d at 189 (emphasizing that "the requesting party should be able to explain why it cannot obtain the same information, or comparable information that would also satisfy its needs, from one of the parties to the litigation"); *see G.D. Searle & Co.,* 126 F.R.D. at 522 (granting the motion to quash the party's subpoena after finding that "much of the relevant material" is "public[l]y available"). Here, by definition, the subpoena calls for information – such as communications between LIV and McKenna – that would necessarily be in LIV's possession. Accordingly, the PGA can and should obtain—and may have already obtained—any work product McKenna delivered to LIV from LIV itself. Case law makes it clear that McKenna should not be burdened with providing information before the PGA establishes that it cannot obtain the materials from the other party to the litigation. *See Jordan,* 921 F.3d at 189. And, to the extent PGA seeks purely internal documents, such as drafts or internal firm communications, that were *never* transmitted to LIV, it

---

[11] Such blunderbuss requests to a non-party, as found here, cannot be defended on the grounds that the LIV-PGA litigation involves a wide-ranging antitrust dispute. Even as to PGA's subpoena to Saudi PIF and Governor Al-Rumayyan, the presiding judge in the Northern District of California narrowed the PGA's subpoenas, finding undue burden, where certain PGA requests "suffer from vagueness and overbreadth which renders them unduly burdensome, particularly in light of PIF's and Mr. Al-Rumayyan's current status as third parties." *Jones, et. al. v. PGA Tour, Inc.,* No. 22-cv-04486-BLF, Doc. No. 380 at 57 (N.D. Cal. Apr. 3, 2023). And, by contrast to the court's finding with respect to Saudi PIF, here it is undisputed that McKenna was not involved in "founding, funding, oversight, and operating" a competing professional golf league, but was merely a consultant and strategic advisor to that golf league.

12

would be difficult to imagine how such non-party materials would be relevant or admissible in the case much less go to the heart of "important issues."

### III. The Court Should Reject the PGA's Effort to Compel the Production of Constitutionally Protected Material That Could Not Form the Basis of Liability in the Underlying Litigation

Finally, the PGA's subpoena must also be quashed, in part, because it seeks from McKenna constitutionally-protected material that could never form the basis for underlying antitrust or tort liability. Most directly, RFP No. 14 requests documents relating to McKenna's purported interactions with "elected and unelected" government officials on a wide range of topics. *See* Knapp Dec. Ex. B.[12] Still other RFPs seek "[a]ll documents and communications" relating to a host of topics that would necessarily encompass any such communications. *Id.*

At the outset, this information has no bearing on the issues in the PGA-LIV litigation, which includes no allegations that any lobbying efforts, congressional action (or even public opinion generally) affected players' decisions to join LIV.[13] Yet, this is not merely another "fishing expedition" by the PGA, but an effort to fish in constitutionally protected waters. Thus, even if the PGA had alleged some sort of injury from LIV's alleged efforts to sway government actors – *and it has not* – those efforts would be constitutionally protected and *could not serve* as a basis of liability under the First Amendment and the *Noerr-Pennington* doctrine. *See Australia/Eastern*, 537 F. Supp. at 808 (quashing because plaintiff failed to show "how the protected activities sought to be investigated might fall under an exception to the *Noerr* doctrine, or as to how the information sought could be relevant in the proof of antitrust violations").

---

[12] Notably, McKenna has agreed to produce any communications with the DOJ regarding PGA or its efforts to limit competition for professional golf.
[13] McKenna has agreed to produce its communications with the DOJ regarding the PGA, if any. *See* Knapp Dec. Ex. J.

13

Forcing McKenna to produce documents related to this kind of petitioning effort would effectively punish it for engaging in First Amendment-protected speech and would undermine the confidence of actual and prospective clients that it can discuss confidential business information with public officials on sensitive matters of public (or private) importance. *Australia/Eastern*, 537 F. Supp. at 808. The chilling effect on public discourse with government officials is not outweighed by any showing that the PGA has made, or could make, with respect to its need for these communications in this case.

## CONCLUSION

For these reasons, McKenna respectfully requests that the Court quash the PGA's subpoena. In the alternative, McKenna requests that the Court modify the PGA's subpoena to limit McKenna's production obligations to that which McKenna has agreed to produce, as set forth in Exhibit I to the Knapp Declaration.

Dated: April 12, 2023

                                               /s/
                           Cailyn Reilly Knapp (VA Bar No. 86007)
                           Jim Kress (*pro hac vice* application forthcoming)
                           Taylor Owings (*pro hac vice* application forthcoming)
                           BAKER BOTTS L.L.P.
                           700 K Street N.W.
                           Washington, DC 20001
                           Tel: (202) 639-7753
                           Fax: (202) 585-4070
                           Email: cailyn.reilly.knapp@bakerbotts.com
                           Email: james.kress@bakerbotts.com
                           Email: taylor.owings@bakerbotts.com

                           *Counsel to Petitioner McKenna Advisors LLC*

**CERTIFICATE OF SERVICE**

I certify that on April 12, 2023, the foregoing was electronically mailed to the following address:

Eric K. Phung
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
Tel: (415) 676-2270
Fax (415) 397-7188
Email: ephung@keker.com

        /s/
Cailyn Reilly Knapp (VA Bar No. 86007)
BAKER BOTTS L.L.P.
700 K Street N.W.
Washington, DC 20001
Tel: (202) 639-7753
Fax: (202) 585-4070
Email: cailyn.reilly.knapp@bakerbotts.com

*Counsel to Petitioner McKenna Advisors LLC*