1

```
                 UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
                    ALEXANDRIA DIVISION

MCKENNA ADVISORS LLC,         .     Civil Action No. 1:23mc8
                              .
              Petitioner,     .
                              .
     vs.                      .     Alexandria, Virginia
                              .     May 12, 2023
PGA TOUR, INC.,               .     10:05 a.m.
                              .
              Respondent.     .
                              .
. . . . . . . . . . . . .

                 TRANSCRIPT OF MOTIONS HEARING
         BEFORE THE HONORABLE WILLIAM E. FITZPATRICK
               UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

```
FOR THE PETITIONER:            JAMES G. KRESS, ESQ.
                               Baker Botts LLP
                               700 K Street, N.W.
                               Washington, D.C. 20001


FOR THE RESPONDENT:            BROOK DOOLEY, ESQ.
                               Keker, Van Nest & Peters LLP
                               633 Battery Street
                               San Francisco, CA 94111


TRANSCRIBER:                   ANNELIESE J. THOMSON, RDR, CRR
                               (703)629-3845
```

(Pages 1 - 79)

(Proceedings recorded by FTR electronic sound recording,
 transcript produced by computerized transcription.)

2

```
1                      P R O C E E D I N G S
2              THE CLERK:  McKenna Advisors LLC versus PGA Tour,
3    Inc., Case 1:23mc8.  Counsel, please note your appearances for
4    the record.
5              MR. KRESS:  Jim Kress, Baker Botts, on behalf of
6    petitioner, McKenna Advisors.
7              THE COURT:  Good morning, Mr. Kress.
8              MR. KRESS:  Good morning.
9              MR. DOOLEY:  Good morning, Your Honor.  Brook Dooley,
10   Keker, Van Nest & Peters, on behalf of the respondent, PGA
11   Tour.
12             THE COURT:  And good morning, Mr. Dooley.  How are
13   you?
14             MR. DOOLEY:  Very well.
15             THE COURT:  All right.  The -- just as a, as a
16   preliminary matter, maybe it makes sense to address and just
17   rule from the bench the motions to seal just so that we can
18   just get that out of the way.  I've reviewed -- and the
19   documents are indeed marked "Confidential" from discovery and
20   pertain to confidential business relationships, for example,
21   the work order, the -- plus some of the analysis of the local
22   rule; and with respect to the statements for sealing, what
23   we're referring to is petitioner's motion to seal, which is
24   identified at Docket No. 4; respondent's motion to seal, Docket
25   15; and respondent's motion to seal, Docket 22.
```

3

1          For each of these motions to seal, the parties have

2     complied with Local Rule 5 by submitting the appropriate

3     memoranda, notice, and proposed orders.  A period of seven days

4     for response or objection has passed after the filing of each

5     motion, with no objections made and only supported -- only

6     support filed for the respondent's motions as well as

7     petitioner's motion.

8          Accordingly, the Court will now determine whether the

9     documents should remain under seal.  While there is a presumed

10    right of public access to court documents, the court may at its

11    discretion seal documents where that right of access is

12    outweighed by competing interest.  That's *In re Knight*

13    *Publishing Company*, 743 F.3d -- I'm sorry, F.2d 231 (4th Cir.

14    1984).

15         Here each party has demonstrated that information

16    documents requested to be sealed are indeed confidential and

17    proprietary in nature, the public disclosure of which would

18    likely cause damage to their business interests.  Therefore,

19    the Court finds that the appropriate standard for filing

20    material under seal has been met, the motions will be granted,

21    and the information in documents requested in, in the

22    respective motions will remain under seal, and will enter an

23    order to that effect today.

24         So now with respect to the motion to quash, again,

25    let me just put on the record just to, just to kind of set the

4

1    stage, and then, and then we'll get into the meat of the

2    argument and where we go from here.  This matter comes to the

3    Court based on petitioner's motion to quash a third-party

4    subpoena served on petitioner, McKenna Advisors LLC, in an

5    action pending in the United States District Court for the

6    Northern District of California.  Petitioner is a nonparty to

7    the underlying lawsuit.  The underlying lawsuit was brought by

8    several professional golfers and LIV Golf, Inc., who are suing

9    the PGA Tour over PGA's conduct related to the player

10   plaintiffs' involvement with LIV Golf, which is a competing

11   professional golf tour.

12           Specifically, the plaintiffs allege that the PGA Tour

13   committed antitrust violations, breach of contracts, and

14   engaged in tortious conduct.  The PGA Tour has counterclaimed

15   against LIV Golf, alleging tortious interference with the PGA

16   Tour's contracts with the player plaintiffs.

17           Petitioner is a small Virginia-based consulting firm

18   that LIV Golf hired as an outside consultant to conduct

19   specific tasks related to LIV's efforts to compete with the

20   PGA.

21           On December 27, 2022, petitioner was served with a

22   subpoena to testify at a deposition and produce documents, with

23   a, with a return date of January 20, 2023.  The subpoena

24   attached 13 deposition topics and 21 requests for production.

25           On March 10, 2023, following meet and confer efforts,

5

1 the respondent amended its subpoena to remove 5 of the 21

2 requests for production and to receive one other request for

3 production -- I'm sorry, to revise one other request for

4 production.  As I understand it, there, there continued to be

5 some discussions.

6        I think I have a general understanding as to where

7 the parties are now, but I'll, obviously, rely on you-all just

8 to make sure that, you know, to frame the issues in dispute,

9 and we'll go from there.

10        Mr. Kress, this is obviously your motion.  I will

11 defer to you in terms of how you want to organize these issues,

12 to tackle these issues.  Obviously, the, the goal today is I

13 will -- I'll rule from the bench.  I'll give you as much

14 clarity as I, as I possibly can so that the parties know

15 exactly what the lay of the land is moving forward, and the

16 documents can be provided, the deposition can be taken, and you

17 guys can continue to advance this case as efficiently as

18 possible.

19        I'm happy to do it any way you think is most

20 profitable.  We can either just go through the, the discovery

21 requests one at a time, we can sort of group the issues,

22 whatever you think is, is best.

23        MR. KRESS:  Thank you very much, Your Honor.  So good

24 morning.  Obviously, it sounds like you are very familiar with

25 the underlying litigation, what brought us here, and really

1    even for the most part what specific discovery is at issue.

2              I do want to say, though, we've been dealing with

3    this subpoena as a nonparty for about five months and feel like

4    it's been a constantly evolving back-and-forth about what is it

5    exactly that the PGA seeks from McKenna and what it is they

6    can't get otherwise.

7              The last actual negotiation before we filed our

8    motion, the big topics listed were public affairs, government

9    relations, and opposition research.  None of those terms even

10   make it into their motion that they've -- excuse me, their

11   opposition to our motion except for the fact that only after we

12   filed our motion have they dropped the government

13   investigations, government communications.  So this is a --

14   this has been an evolving pattern.

15             Stepping back, though, look, McKenna does not argue

16   that it is exempt or immune from discovery.  Nor do we argue

17   that the work that we did on behalf of LIV, that a lot of it

18   may not be relevant to the underlying litigation, right?

19             So clearly from day one, we had agreed and produced

20   what was our work order, what were the tasks that we were given

21   by LIV.  We've also confirmed with them that we had no separate

22   engagement, no separate work order from PIF or the Kingdom of

23   Saudi Arabia or anyone else.  That was it.

24             Where the issues in the case overlap with our work

25   clearly related to communications with players, agents about,

7

1    you know, player, you know, player solicitation, player

2    recruitment, contracts, and compensation.  We didn't have to

3    file a motion to get here on those topics, Your Honor.  We'd

4    agreed to that from day one.

5           They -- we've had a meet and confer, and they said,

6    look, you might have talked to those -- about those topics with

7    PIF.  PIF is not a party to the case.  Maybe it is now on their

8    counterclaim.

9           We actually said, you know what, Your Honor?  If

10   that's what will make this go away, we'll give you our

11   communications with PIF related to player recruitment, player

12   solicitation, compensation, contracts.  Again, that's the heart

13   of their case.

14          When we were here on the motion to transfer the other

15   day, you know, they cite in their brief the idea that the court

16   in California had already ruled that, that discovery from PIF

17   is, is highly relevant in this case, right?  And then they

18   quote, though, and the quote says:  "with respect to player

19   recruitment, player solicitation, player contracts."  That's

20   page 6 of their motion -- of their motion to transfer.  That's

21   a direct quote.  That's what the court said was relevant.

22          Again, we've given to them that before we ever had to

23   file this motion, and we --

24          THE COURT:  I'm sorry to interrupt, but that includes

25   PIF as well as Mr. Al-Ramayyan?

8

1          MR. KRESS:  Yes, yes.  Yes, Your Honor.

2          So, so that -- again, we agreed to that before we had

3    to file this motion.  There's no -- every negotiation has been

4    if we offer to give something at the heart of it, that's a

5    compromise, the answer is:  That's great.  Now we want

6    everything else.  We're here to talk about everything else, not

7    what's at issue in this case.

8          So we heard you yesterday -- or, excuse me, Wednesday

9    on a motion to transfer, you said, look, be very specific to

10   the extent that the court in California has ruled on discovery

11   matters and has provided guidance, let's be very specific, not

12   general, that they've said discovery as to PIF, for example, is

13   related or relevant.

14         If I may approach for one second, Your Honor?

15         THE COURT:  Just use a court security officer.

16         MR. KRESS:  Sure.

17         MR. DOOLEY:  What is this?

18         MR. KRESS:  This is your -- the order that was

19   attached to the hearing on the PIF motion to compel.

20         MR. DOOLEY:  Is this an exhibit?

21         MR. KRESS:  That was Exhibit A.

22         MR. DOOLEY:  Is it an exhibit to your papers?

23         MR. KRESS:  No.  We just discovered this after the

24   hearing.

25         MR. DOOLEY:  Oh, I see.

1           MR. KRESS:  So -- do you want one more, ma'am?

2           THE CLERK:  No.  He can't talk at the same time.

3           MR. KRESS:  Oh, I'm sorry.  So, so we were -- you

4    know, we took your -- we took your statement to heart, and we

5    noticed that they attached a 59-page decision that related to

6    the PIF dispute.  Fifty-eight pages of it, I think, were

7    related to sovereign immunity, qualified common law immunity,

8    and about 2 pages of it actually dealt with the discovery

9    dispute as to PIF.  PIF is a party.  We are a nonparty.

10          Even there, Your Honor, the one piece of that filing

11   that they didn't attach was the actual order, or the exhibit to

12   the order where the court went through and the parties

13   addressed the discovery to PIF.  The cross-outs are made by the

14   court.

15          So, for example, while we're here today, essentially

16   when they ask for all communications with PIF about the PGA,

17   about LIV, about the establishment of a competing golf tour, if

18   we look at No. 13, again, discovery even as to PIF the court

19   has stricken.  Communications and agreements with third

20   parties, including consultants and banks, related to LIV or the

21   development of a professional golf league or tour, that's us,

22   Your Honor.  We're a consultant.  We weren't even a consultant

23   to PIF, by the way, but -- so they are seeking from us much

24   more, frankly, than they can get in the Northern District of

25   California.

1          A couple of these other strike-outs are going to be

2     relevant to a few of the other topics that we're going to talk

3     about today, but that was the one piece of information that was

4     not included with the description of the underlying discovery

5     as to PIF.

6          Now, when it comes to the communications with golf

7     stakeholders, right, that's their Spec 14, I believe, in their

8     motion, and, you know, this is probably the only discovery

9     motion I've ever argued where the party seeking discovery never

10    actually cites what their document requests are.  So they may

11    make it sound like, you know, sort of very narrow with respect

12    to what they're seeking, but Request No. 14 actually says all

13    communications with, and they've struck a few topics,

14    government officials.  It includes sports media, professional

15    golf, equipment manufacturers, venue or course owners, golf

16    trade associations.  The topics:  the PGA Tour, LIV, LIV's

17    efforts to establish a competing tour, Golf Saudi, the Kingdom

18    of Saudi Arabia, the Kingdom of Saudi Arabia's human rights

19    records.

20         This is, this is not just communications with these

21    other third-party golf stakeholders who might have been

22    interested in doing business with LIV.  We clearly had some

23    communications with those entities about whether or not they

24    might have had interest in doing business with LIV.  We

25    actually think that they have the better of that argument, and

1    we agreed in our paper, said, okay, if that's what you're

2    talking about, not Kingdom of Saudi Arabia human rights

3    records, not anybody and everywhere, we'll give you our

4    communications.

5            We report to our client.  We tell them, hey, did we

6    talk to a broadcaster?  Did we talk to a tournament host?  Are

7    they saying they will or will not do business with you?  Did

8    they tell us why?

9            We said we'll give them that.  That's -- again, we

10   need to talk about what we're not here for.  They want

11   everything else.  They want --

12           THE COURT:  How do we get there?

13           MR. KRESS:  Yeah.

14           THE COURT:  What I -- and I, and I understand your

15   argument, I take your point, but it seems to me just

16   mechanically for today's purposes --

17           MR. KRESS:  Um-hum, yes.

18           THE COURT:  -- right, because on some level, it

19   almost seems like we're trying to catch smoke in our hands.

20           MR. KRESS:  Exactly.

21           THE COURT:  That maybe what we ought to do is just go

22   through Request for Production No. 1, hear your position, hear

23   the PGA's position.  I'll give you a ruling --

24           MR. KRESS:  Okay.

25           THE COURT:  -- and we'll move on to Request for

1    Production No. 2.

2          MR. KRESS:  Perfect.

3          THE COURT:  And I think if we handle it that way,

4    then at least by the end of today, whether you agree or

5    disagree with what I do, everybody will sort of know what the,

6    what the lay of the land is moving forward.

7          Does that, does that make sense?

8          MR. DOOLEY:  May I be heard on that, Your Honor?

9          THE COURT:  Sure, absolutely.

10         MR. DOOLEY:  That makes perfect sense to me, Your

11   Honor.  The only suggestion I have is the, the requests have

12   been grouped in the briefing, and so it may make sense to go

13   through the requests subject by subject.  That would be my only

14   suggestion.  And some of the requests are not at issue, but

15   that would be my only suggestion.

16         THE COURT:  Absolutely fine.  I mean, whatever --

17   honestly, whatever you think makes the most sense to kind of

18   organize the ideas and organize the thoughts.  I mean, it is

19   Mr. Kress's motion, so I'm going to -- I'm going to let him

20   sort of figure out exactly what the path forward is, but, I

21   mean, my goal is just to be able to make sure that if there is

22   a dispute and it's a meaningful dispute --

23         MR. KRESS:  Right.

24         THE COURT:  -- it gets resolved.

25         MR. KRESS:  Understood, Your Honor.  Thank you.

1        So if I may -- and agreeing with Mr. Dooley -- not

2  everything is in dispute.  So I think that the -- I think if we

3  look at their opposition brief --

4        THE COURT:  Okay.

5        MR. KRESS:  -- they've essentially, you know, I think

6  they've essentially grouped these things as, you know, that

7  with, excuse me, McKenna's communications with third-party golf

8  stakeholders, that's the first one, that's No. 14.

9        THE COURT:  Okay.

10        MR. KRESS:  And again, what we -- we have already

11  agreed to give communications with players, agents, with our

12  client about our communications with players, agents,

13  contracts, compensation, player solicitation.  That's off the

14  table.

15        THE COURT:  So maybe it makes sense for me to hear

16  from the, from the PGA about, about with respect to --

17        MR. KRESS:  14?

18        THE COURT:  -- RFP 14, what they think they're

19  entitled to that you haven't already agreed to give them.

20        MR. KRESS:  I think that would make a lot of sense.

21  Thank you, Your Honor.

22        MR. DOOLEY:  Thank you, Your Honor.  If I might,

23  before I address Topic 14, if I might make a few general points

24  that I think are responsive to Mr. Kress and help frame this

25  discussion, the, the first point that I, that I think is

1    important for the Court to have in mind is that the petitioner,

2    McKenna, is trying to artificially narrow what the underlying

3    case is about.

4            You heard from Mr. Kress that the heart of the case

5    is about player solicitation and the, and the Tour's

6    enforcement of its regulations that arguably prevent the

7    players from moving over to LIV.  That's certainly one element

8    of the case, and we appreciate McKenna's agreement to produce

9    those documents, but that is far from the only thing that's in

10   the case, and I think that's important as we start to look at

11   these other topics.

12           And if I might, Your Honor, Exhibit E to Ms. Knapp's

13   declaration is the amended complaint.  This is LIV's amended

14   complaint.

15           THE COURT:  The 115-page --

16           MR. DOOLEY:  115 -- I'm not going to read all 115

17   pages --

18           THE COURT:  Okay.

19           MR. DOOLEY:  -- but helpfully, there's a synopsis in

20   the front, in the introduction.

21           THE COURT:  Yep.

22           MR. DOOLEY:  Paragraph 11 alleges the Tour's conduct

23   has included at least seven practices, each of which is

24   exclusionary, anticompetitive, and unlawful under the Sherman

25   Act, and then it goes on to describe threatening player

1    plaintiffs and members; amending and expanding its media rights

2    and conflicting events regulations; orchestrating a group

3    boycott with the European tour to ensure that any golfer who

4    considers defying the Tour's threats cannot pursue his career;

5    encouraging PGA of America to disallow golf -- LIV Golf players

6    from playing in the major tournament it sponsors; leaning on

7    Augusta National; threatening agents and business partners;

8    threatening vendors and small companies in the golf and sports

9    production industry; threatening sponsors and broadcasters that

10   they must sever their relationship with players that join LIV

11   Golf.

12          There's two separate monopolization claims in the

13   case, two Section 2 claims, and a Section 1 claim alleging a

14   group boycott of LIV.

15          So a lot more conduct is at issue in this case than

16   just the recruitment of players.  I think that's an important,

17   an important thing to keep in mind.

18          The second thing that I, that I think is important to

19   keep in mind is -- I'll come back to that, but let me talk

20   about Request 14.

21          THE COURT:  And I do think it's, it's probably just

22   fair for you-all just to maybe give you at least my general

23   impression right now, and -- which I'm not wedded to, right, I

24   mean, I'll hear your argument, and please, you know, feel free

25   to correct me if I'm wrong, I obviously haven't lived this case

1    the way you-all have lived this case, but I think to your

2    point, Mr. Dooley, the -- it does seem that when you consider

3    the claims, the nature of the claims, the nature of the

4    counterclaims, when you consider potential defenses to both, if

5    the parties satisfied their burden, damage issues, my sense is

6    that, that the discovery in this matter is probably a little

7    more broad than in many cases.

8            I think that's just the nature of the case.  It's the

9    nature of the, of the antitrust claims, it's the nature of

10   the -- I think it's just the nature of the litigation.

11           I also think although this Court typically, not just

12   me but I think typically in the Eastern District of Virginia,

13   we really, really work very hard to make sure nonparties are

14   not unduly burdened.  We work very hard to make sure that the

15   parties bear the laboring oar of the litigation, but my sense

16   is that McKenna is not a typical nonparty.

17           I do think that, that McKenna seems to be intricately

18   involved in the underlying facts, and it does seem that McKenna

19   is a likely repository for a lot of properly discoverable

20   information.  Now, it doesn't mean that the doors are

21   completely blown open and, and, you know, you're going to have

22   to turn over your entire business files to, to the PGA, but I

23   do think that just generally speaking, again, just considering

24   the nature of the claims, counterclaims, defenses, potential

25   damages issues, and the role that McKenna played, I think it

1   is -- I think that they are, they are going to be an active

2   participant in the discovery process.

3            And I just say that because I just want to make sure

4   you-all knew at least what my initial impressions are, and if

5   that helps -- you know, if you want to disabuse me of some of

6   those thoughts, I promise you I'm coming to this with an open

7   mind, but that's at least the sense that I get from the, the

8   submissions of the parties.

9            So with that, if you want to just move to 14 and

10  we'll see exactly what language we need to -- how, if at all,

11  we need to, to cabin in 14.

12           MR. DOOLEY:  Absolutely.  Thank you, Your Honor.

13           Let me talk about why Request No. 14, which calls for

14  McKenna's communications with sponsors, broadcasters, vendors,

15  hosts, that kind of thing, why are those communications

16  relevant.  First, they're directly relevant to LIV's

17  allegation --

18           THE COURT:  It doesn't sound like they're contesting

19  those.

20           MR. DOOLEY:  Sorry?

21           THE COURT:  It doesn't sound like they're contesting

22  those.

23           MR. KRESS:  Exactly, Your Honor.

24           MR. DOOLEY:  You are --

25           MR. KRESS:  We're here to talk about what else.

18

```
1            THE COURT:  Yeah.

2            MR. DOOLEY:  No, they are contesting the

3   communications.  They haven't agreed to produce their

4   communications with third-party broadcasters, sponsors,

5   vendors.

6            Have you?

7            MR. KRESS:  Your Honor, if that will make this

8   dispute go away, we'll give it.  That's why we've been trying

9   to have negotiation on these topics from four months ago.

10           MR. DOOLEY:  Your Honor, that -- this is the first

11  I've heard of it.  I'm happy --

12           THE COURT:  That's --

13           MR. DOOLEY:  If we can resolve it, we can resolve it.

14  If they'll produce --

15           THE COURT:  It's all good.  We're just trying to

16  solve problems and move ahead, so that's fine.  So if we, if we

17  just go down RFP 14, it sounds like there's no dispute with

18  respect to communication with professional golfers, with

19  respect to agents, sports media, sponsors of professional golf.

20           Is there any dispute about, Mr. Kress, with respect

21  to equipment manufacturers?

22           MR. KRESS:  No, Your Honor.

23           THE COURT:  Venue or course owners?

24           MR. KRESS:  None.

25           THE COURT:  Golf trade associations regarding the PGA
```

19

1    Tour?

2             MR. KRESS:  None.

3             THE COURT:  As well as the rest of those entities?

4    Okay.

5             MR. KRESS:  No, that's right, Your Honor.  It's

6    this -- it's this broad, every communication ever, including,

7    and it's Kingdom of Saudi Arabia, Kingdom of Saudi Arabia human

8    rights records.

9             You know, if we're producing a communication and the

10   party we're communicating with brings those topics up, if it's

11   in the communication, then obviously, that's responsive; we're

12   going to give that.  But we're not, you know -- we're here to

13   talk about what the claims of the case are.

14            THE COURT:  So tell me specifically, Mr. Kress -- and

15   I'm sorry to keep doing the back-and-forth, but I can promise

16   you --

17            MR. DOOLEY:  That's fine, Your Honor.  And if it's

18   helpful for Mr. Kress to come up --

19            THE COURT:  I can promise you I'm going to get in

20   trouble --

21            MR. DOOLEY:  Sure.

22            THE COURT:  -- because, you know, the recording

23   device really does only pick up people at the, at the podium.

24            MR. DOOLEY:  I don't have any secret notes.

25            MR. KRESS:  No.

20

1          THE COURT:  So, so tell me specifically, Mr. Kress,

2    with respect to 14, how you want 14 narrowed in those last

3    three lines.

4          MR. KRESS:  Sure.  What we had agreed to previously,

5    Your Honor, was the communications with our clients about those

6    interactions we had with third-party golf stakeholders, right?

7    And so now I think what we are agreeing -- they're saying we

8    also need the underlying communications, regardless of whether

9    or not we transmitted those to our client.

10         THE COURT:  Okay.

11         MR. KRESS:  And so if those are with respect to, you

12   know, the opportunity of doing business with LIV or why they

13   don't want to do business with LIV, that's what we are --

14   that's what we're agreeing to.

15         THE COURT:  Okay.  So, so we have a dispute over the

16   scope of all communications.

17         MR. KRESS:  Correct.

18         THE COURT:  And then with respect to the last three

19   lines, efforts to establish a competing professional golf tour,

20   Saudi PIF, Golf Saudi, the Kingdom of Saudi Arabia, the Kingdom

21   of Saudi Arabia's human rights records, it sounds like there's

22   an objection there.

23         MR. KRESS:  Yeah, Your Honor.  Again, if those

24   topics, though, if that's part of the underlying communication

25   with a third party, so be it.  That, that would be produced as

21

1    part of the discovery.

2          THE COURT:  Okay.  And DOJ's investigation of the PGA

3    Tour, the same thing?

4          MR. KRESS:  I believe that's been dropped, but I'll

5    let Mr. Dooley speak to that.

6          THE COURT:  Okay.

7          MR. DOOLEY:  We, we can drop that one here, Your

8    Honor, yep.

9          THE COURT:  Okay.  So really it just sounds like that

10   the thrust of 14 is whether or not it should be limited to all

11   communications between McKenna and their client or

12   communications between McKenna and the individual sponsors of

13   professional -- the individual entities within that, that

14   range; is that right?

15         And your argument is most of those, as I

16   understand -- please correct me if I'm wrong --

17         MR. KRESS:  Yeah.

18         THE COURT:  -- that most of those communications were

19   passed on to your clients in any event.

20         MR. KRESS:  Correct, Your Honor.  So our internal

21   communications never passed on, I think I have a hard time

22   seeing how that's relevant to a discoverable much less leads to

23   admissible evidence.  We're not a part of the case, but again,

24   if that's, you know, if their claim is that LIV has argued that

25   interference with those kind of stakeholder relationships have

1   caused damage, right, and now it's somehow we never even

2   bothered to communicate that to LIV, so they're not going to

3   use it in the case, but that's fine, Your Honor.

4          If it's would they be willing or interested in doing

5   business with us and why or why not, that's fine.  We'll agree

6   to give that to us -- to them.

7          THE COURT:  All right.  Is that enough for you,

8   Mr. Dooley?

9          MR. DOOLEY:  I think so.  I just want to make sure I

10  understand what the offer is on the table.  Previously, the

11  offer had been communications with LIV and with PIF about

12  McKenna's communications with third parties.  Now I understand

13  that McKenna is offering to produce its communications with

14  third parties to the extent that they relate to these topics.

15         THE COURT:  Is that your understanding?

16         MR. KRESS:  Correct, Your Honor.

17         THE COURT:  All right.

18         MR. DOOLEY:  I think we're done with 14.

19         THE COURT:  Perfect.  I consider that a great

20  personal success.

21         MR. DOOLEY:  Your Honor, you're doing, you're doing

22  better than we did in our meet and confer, so --

23         THE COURT:  What do you want to wrestle with next?

24         MR. KRESS:  We're going to wrestle, Your Honor.

25         If you mind --

23

1           MR. DOOLEY:  Sure, sure.

2           MR. KRESS:  Yeah, so let me, let me turn to the next

3    one.  And so again, the way we look at this, how we came here

4    today, what they had agreed to narrow to was all, all of our

5    communications with external parties; all of our communications

6    with internal parties, LIV and PIF; all the media strategy

7    documents; and then all of our internal documents related to

8    all of the above.  That's everything that's at the company.

9    That's everything.

10          So Request No. 13 is their next one, Your Honor.

11   Here they asked for all documents and communications related to

12   discussions with LIV, Saudi PIF, third parties working on the

13   LIF or Saudi PIF relating to the PGA Tour.  That is pretty much

14   the scope of our engagement.

15          And I'm sorry, Your Honor, one reason we handed you

16   the order earlier today, even when they were saying PIF is all

17   part of this, the court out in California said no, we're not

18   going to let you just give -- you know, you can't just ask for

19   all communications or agreements with third parties, including

20   consultants, related to LIV or the developments of a

21   professional golf tournament or league.

22          That's already been decided.  That's been decided by

23   the issuing court as to a party.

24          THE COURT:  Okay.

25          MR. KRESS:  Now they want to go to a consultant and

24

1  ask for the same thing that they were just told they couldn't

2  get.  So, Your Honor, the basic argument here is this is

3  essentially everything.  There's no effort to modify or narrow

4  this at all.

5      We have agreed to -- and they, they point out -- like

6  I said before, they did point out, right, I understand your

7  comment and it's correct and Mr. Dooley's argument is well

8  known that maybe the complaint in the case is broader than

9  player solicitation or the PGA rules restricting player

10 solicitation, but when they cited to you repeatedly that

11 argument as to PIF in the Northern District of California and

12 say that the judge has ruled that all of this discovery is

13 relevant, again, page 6 of the motion to transfer, this is,

14 this is a quote from their brief:  PIF's conduct particularly

15 in financial backing of LIV, she found, is essential to the

16 Tour's theory that LIV interfered with its contracts with

17 golfers, right?

18     We have agreed to give that before we ever came here

19 today.  So when they want to say that's not the heart of the

20 case, that's still the heart of the case.  There might be other

21 things at issue.  That is the heart of the case.

22     And now we've also agreed, like I said, we've agreed

23 to our communications with our clients as to alleged other

24 business relationships that have been interfered with.  So

25 we're now literally talking about anything else, any other

25

1   strategy, any other media strategy, any other PR campaign,

2   anything that's not at issue in this case, whether Jay Monahan

3   pays taxes, whatever it might be, none of those things are at

4   issue in the case, Your Honor, and certainly not sort of

5   narrowly tailored for a third party.

6           And again, I respect your, your notion that we're

7   different than a pure bystander.  We agree with that.  We

8   don't, we don't dispute that.

9           THE COURT:  Mr. Dooley, this does seem to be a bit of

10  a blockbuster RFP, right?  Is there any way to make this,

11  number one, not duplicative of other requests and a little more

12  tailored to the specific theories in the case?

13          MR. DOOLEY:  Your Honor, let me, let me address that.

14  I mean, the -- first of all, the request is not -- as drafted

15  is not every communication with PIF.  It's every communication

16  with PIF relating to the Tour.  That's, that's the scope of the

17  request.

18          Additionally, McKenna's only involvement with LIV,

19  its entire relationship with LIV is related to competing with

20  the PGA Tour.  If you look at Exhibit 12, which is the work

21  order, it's under seal so I'm not going to quote it, but if you

22  look at the very first sentence, it describes broadly speaking

23  what McKenna's remit is, and it's to help LIV compete with the

24  PGA Tour.

25          So Mr. Kress is saying, well, this might include

1    every communication with PIF, but that doesn't make the request

2    overbroad if all of their communications are relevant to the

3    case.  An overbroad request sweeps in things that are

4    irrelevant.  There's nothing irrelevant that Mr. Kress has

5    identified that would be included in its communications with

6    PIF, which is really the heart of this request, No. 13.

7            Let me also, Your Honor, I think it's, it's

8    worthwhile just -- we've talked about this recent CMC.  This

9    is -- this was a CMC held a couple weeks ago by Judge Freeman

10   in the underlying matter, and let me, if I might, this is

11   Exhibit 1 to Mr. Phung's declaration in support of our

12   opposition, and this CMC arose, and we talked about this a

13   little bit on Wednesday, arose in the context of the motions to

14   quash the subpoenas to PIF were denied, they were ordered to

15   produce discovery, they refused to comply, they're appealing,

16   there's no stay of discovery, but they're not complying with

17   the subpoenas, and the court said, okay, I understand that, but

18   I'm going to let discovery go forward, and her direction was,

19   Tour, you need to go out and get documents from the people who

20   communicated with PIF.

21           And just if I, if I might quote, I'm looking at this

22   is page 38, we attached an excerpt:

23           "THE COURT:  All right, that's fine.  And did you

24   send third-party discovery to any of these asking them for all

25   of their correspondence with PIF and Al-Ramayyan?"

1           My partner, Mr. Peter, responds.  Then the court goes

2    on, this is line 9:  "You need to send out discovery to each of

3    those deponents and get everything they have that is a

4    correspondence with PIF and Al-Ramayyan."

5           Mr. Peters responds:  "We're trying."

6           "THE COURT:  I just think you need to do it."

7           On the next page:  "And if you've not subpoenaed all

8    communications they had with PIF and Mr. Al-Ramayyan, you need

9    to do that, and then you need to depose them.  You have to do

10   that."

11          The court has made very clear that the Tour -- that

12   the court understands the significance of PIF, understands its,

13   its relevance not just to issues of player interference.  I

14   mean, I can quote from the court's order sustaining the

15   magistrate judge's order on the motion -- denying the motion to

16   quash.  I mean, the court unequivocally says -- well, I mean,

17   describes all of the relevance of, of PIF:  founded LIV as a

18   disruptor business vis-a-vis the Tour; funded LIV with 100

19   percent of the start-up costs; oversees its operations,

20   including strategic and financial planning; taking a direct

21   role in LIV's operations; negotiation of player contracts;

22   discussions with potential sponsors.

23          The magistrate judge concluded that PIF's commercial

24   conduct outside the United States, including formation,

25   funding, oversight and operation of LIV, caused a direct effect

1   inside the United States; and the court was absolutely clear

2   that the evidence from PIF is relevant not just to the Tour's

3   counterclaims but also to defending LIV's claims.

4           So communication -- PIF is a central actor in every

5   piece of this case.  McKenna was retained to help LIV, which is

6   a creation of PIF, compete with the Tour, which is what this

7   case is about.  All the tasks on that work order are directed

8   to competing with the Tour, including digging up dirt on Jay

9   Monahan and others.  So their communications with PIF are

10  relevant.

11          And this isn't, this isn't a fishing expedition by

12  any stretch of the imagination, Your Honor.  This is not, oh,

13  maybe there's some communications, maybe they talked to PIF.

14          We know that Mr. McKenna, the principal at McKenna,

15  has direct text message communications with senior executives

16  in Saudi Arabia at PIF.  We know that he attended meetings

17  personally with Mr. Al-Ramayyan, the governor of PIF and second

18  only at PIF to the crown prince.

19          We know that Mr. McKenna attended board meetings not

20  of LIV Golf, Inc., the entity in the case, but its parent

21  company, which is nominally based in Jersey, at Channel

22  Islands; and, and Mr. McKenna is there with senior PIF

23  executives, including Mr. Al-Ramayyan, who sit on the board of

24  these parent companies.

25          So there's really no question that there's relevant

1   communications between McKenna and PIF.  The court in

2   California has made clear that PIF is directly relevant to the

3   case, and so the Tour believes that production of McKenna's

4   communications with PIF regarding the Tour is warranted in this

5   situation and, and entirely justified.

6           THE COURT:  So, Mr. Kessler, it does -- or, I'm

7   sorry, Mr. Kessler -- Mr. Kress, it does seem -- I'm sorry, I

8   interrupted you.  Do you want to argue?

9           MR. KRESS:  I did, Your Honor.

10           THE COURT:  Please.

11           MR. KRESS:  Briefly.

12           THE COURT:  Please.

13           MR. KRESS:  I think Mr. Dooley's answer to your

14   question whether there was any possible way to narrow a request

15   that's all documents and communications --

16           THE COURT:  Because the answer was no.

17           MR. KRESS:  -- with LIV or Saudi or --

18           THE COURT:  Right.

19           MR. KRESS:  -- anyone on behalf of LIV or Saudi

20   relating to the PGA Tour, he basically answered the question

21   yes, that is everything that McKenna does.

22           THE COURT:  I gotcha.

23           MR. KRESS:  And so we don't think that's fair.  We

24   think that what he said about the, the prior court order or the

25   discussion in the -- in a discovery conference out there, not

1  about discovery from PIF but about whether to go ahead and seek

2  discovery from third parties, I think he's ruling out the idea

3  that "seek every communications" means those that are relevant

4  to the claim.

5       PIF is in the case for one claim.  It's their alleged

6  tortious interference.  The judge ruled, and they cite it in

7  their paper, it's relevant to player solicitation and

8  contracts.

9       What did the court order when it had discovery from

10  PIF, what got struck?  All communications and agreements with

11  consultants related to LIV or the development of a professional

12  golf league or tour.

13       It's clearly not anything that anybody ever

14  communicated with PIF about.  It's got to be related to a claim

15  or defense in the case.  We've been trying to get at that,

16  again, for four months.

17       THE COURT:  But isn't what -- I guess I have two

18  questions.  Isn't what -- on its face, right, the request seems

19  a little broad, but given the facts of this case and given the

20  fact that, that I think, as Mr. Dooley points out, the entire

21  purpose of McKenna's involvement is to engage in efforts that

22  really are the subject of both the claim and counterclaim,

23  depending on how you --

24       MR. KRESS:  Sure.

25       THE COURT:  -- depending on how you want to splice

1    it, so this isn't a situation that we often see, right, where

2    there are -- where the litigation is involving one issue, we

3    want to stay focused on that, we want to stay proportionate,

4    and the parties are dealing with 11 other things or a hundred

5    other things, right?

6              MR. KRESS:  Yeah.

7              THE COURT:  What their -- their relationship is

8    entirely centered on facts that do seem to bear on some aspect,

9    whether it's coming or going, whether it's the claims or

10   counterclaim, of -- because I'm not sure it's just related to

11   their counterclaim, right?  I mean, you could see a path that,

12   that it could also, you know, it could also impact their

13   defense.  You could see how it can also impact -- you know, I'm

14   not going to try your --

15             MR. KRESS:  Sure.

16             THE COURT:  You know, but I think it -- I think

17   there's a reasonable path there to a little bit more of a broad

18   perspective, but I guess my point is isn't it -- or my question

19   is does it -- isn't it a little bit different here, where the

20   engagement is almost exclusively tied to the core issues being

21   litigated in San Francisco?

22             MR. KRESS:  So yes, Your Honor, that, that would be

23   different, and clearly, as we've talked about, player

24   recruitment, player solicitation, player compensation, no

25   question about it, they get that.  We agree.  That, that is the

1    direct overlap between the claims and the counterclaim and our

2    engagement.

3            The second piece, if they're saying that LIV is also

4    claiming that there was interference with broadcasters,

5    vendors, sponsors, equipment manufacturers, we've agreed to

6    give them that.  No question there's an overlap there.

7            You have to look at what else, lobbying the

8    government?  There's all sorts of facets where parties compete

9    that are not at play there.  If we're trying to promote LIV in

10   a positive light in the media or social media or if we're

11   trying to expose the hypocrisy of PGA, whatever it might be, in

12   the media or social media, that has nothing to do with the

13   claims in this case, Your Honor.

14           THE COURT:  But would that be responsive to this RFP?

15           MR. KRESS:  I think they're saying it is.  It's every

16   communication about everything.  We're only doing the work

17   because it relates to the PGA Tour.  I don't think that's a

18   narrowing at all.

19           THE COURT:  I don't think -- the way I read it, it's

20   discussions with respect -- it's all communications related to

21   discussions with Saudi PIF or third parties working on behalf

22   of LIV --

23           MR. KRESS:  Right.

24           THE COURT:  -- or Saudi PIF.

25           So, I mean, I think if there are -- if there are

33

1   communications with -- if there are lobbying efforts with

2   public officials, I'm not sure I would see that as responsive

3   to this RFP just on the face of it.  I mean, it seems like, you

4   know, they're, they're looking for communications.

5           I mean, I take your point --

6           MR. KRESS:  Right.  And I think that was your initial

7   question to Mr. Dooley:  Can we narrow this to what you think

8   is actually at issue?

9           THE COURT:  Well, so Mr. Dooley's view is, is --

10          MR. KRESS:  Everything.

11          THE COURT:  -- no.

12          How do you propose that it be narrowed?

13          MR. KRESS:  Sure.  Our proposal was those, was those

14  things:  player contract solicitations, all of that.  We get

15  that, right?  Contract solicitations, compensation, all those

16  topics, that's clearly the core of the case, regardless of what

17  anyone else says, right?

18          Whether PGA ever restricted players from playing,

19  that's the claim.  Whether they interfered with our ability to

20  recruit players, that's the claim.  Whether we tortiously

21  interfered with their player contracts, that's the

22  counterclaim.  That -- those are the claims.

23          Now, if they also say there are stakeholders, that's

24  what we've agreed to give them.  If we're communicating with

25  broadcasters, broadcaster says:  We would love to carry LIV

34

1    Golf, but you know what?  The PGA has threatened us and is

2    going to make our lives miserable, we can't do it, we're

3    producing that.

4              On the alternative --

5              THE COURT:  But these are just communications, right,

6    with respect to Saudi PIF or other presumably consultants or

7    entities who are working on behalf of LIV, right?

8              MR. KRESS:  Right.

9              THE COURT:  So, I mean, the way I read this is

10   they're looking for communications with -- within the LIV

11   umbrella.

12             MR. KRESS:  Right, related to the PGA Tour.

13             THE COURT:  Related to the PGA Tour.  Which is --

14             MR. KRESS:  That's every document.

15             THE COURT:  Well, but, but isn't that a product of

16   the nature of the engagement, right?  I mean, it was not -- the

17   relationship between, as I understand it --

18             MR. KRESS:  Yeah.

19             THE COURT:  -- the relationship between McKenna and

20   its client was not, you know, we are handling generally -- or

21   general public affairs.

22             We are handling, you know --

23             MR. KRESS:  They have those too, Your Honor.  We're

24   going to get to that request next.

25             THE COURT:  Well, that's not -- but that's not this,

1    that's not -- I don't see that necessarily as this request.

2           MR. KRESS:  I think if they're saying we're talking

3    about public affairs strategy, I think they're saying that's

4    in.  Everything we do is related to PGA Tour, right?  We're

5    trying to develop a golf league.

6           You're right, that, that is the nature of our

7    retention with our client, LIV, but that doesn't mean that

8    that's what's relevant in the litigation between LIV and the

9    PGA Tour; and they're trying to conflate those two things.

10          THE COURT:  I understand your opinion.  Is there

11   anything, anything else that you can point to from a ruling by

12   either the magistrate judge in California or, obviously, the

13   district judge in California that would, that would either

14   support your position or, or allow me to sort of narrow this in

15   a way that is clearly consistent with their intent?

16          MR. KRESS:  Sure, Your Honor.  So first of all, like

17   I said, it's already clear that the court in Northern

18   California struck this exact request.  It can't be all

19   communications with a consultant related to LIV in the

20   development of a professional golf league.  That's been struck

21   already, saying that's too much.  So that's already happened.

22          The other pieces of that, if you look at that order,

23   Your Honor --

24          THE COURT:  And I'm sorry, that was what you just

25   handed up recently, correct?

36

1        MR. KRESS:  Correct.  That was Exhibit A to the order

2  on PGA's motion to compel PIF, discovery from PIF, not a third

3  party, discovery from PIF, saying no, we're not going there.

4        And if you look, that would be No. 13, Your Honor.

5        THE COURT:  Was that 13?

6        MR. KRESS:  Yep.  And so what else we're concerned

7  with, right, if we look at -- even if we look at this order,

8  what has been -- what else has been struck?  Documents and

9  communications relating to actual potential benefit of the

10 Kingdom of Saudi Arabia, Saudi Arabia monarchy, hosting golf

11 events, assisting with professional golf.  That has been

12 struck.

13        Documents and communications related to complaints,

14 criticisms, negative opinions about LIV, you, the Kingdom of

15 Saudi Arabia, professional golf, participating in LIV events,

16 Saudi Arabia, struck.

17        So yeah, there's, there's a whole bunch of this where

18 it's been very specific.  Again, this is even as to a party PIF

19 saying you can't go that far.  It's not anything and

20 everything.

21        And we think this is -- this goes throughout, Your

22 Honor.  We think that, frankly, they're just fishing.  You've

23 seen their search terms.  Search terms say related to the human

24 rights, Khashoggi, Saudi human rights record, Saudi government,

25 9/11.  This has nothing to do with golf.

37

1           We think we -- we think we understand why we're here.

2           THE COURT:  Well, antitrust revelations don't always

3    have -- are exclusively limited to what the underlying product

4    is, right?

5           MR. KRESS:  Right.

6           THE COURT:  I mean, that's one of the -- that's one

7    of the challenges of an antitrust case is you're really looking

8    at the anticompetitive behaviors, as opposed to what --

9           MR. KRESS:  And if we were talking about the golf and

10   not human rights, Saudi government, 9/11, Khashoggi --

11          THE COURT:  I suspect -- I gotcha.  I suspect

12   we'll -- I suspect we'll get there.

13          MR. KRESS:  Okay.

14          THE COURT:  The -- Mr. Dooley, why -- with respect to

15   No. 13, why shouldn't that guide this decision?  What, what

16   material -- what's materially different between that ruling and

17   this?

18          MR. DOOLEY:  Well, Request 13 was much broader than

19   what we're asking for, Your Honor.  That related to

20   communications and agreements related to LIV or the development

21   of a professional golf league or tour.

22          That's not what we're asking for.  We're -- I mean,

23   communications -- we're asking for McKenna's communications

24   with PIF related to the PGA Tour, related to us, the Tour, as

25   opposed to related to LIV and LIV's development of a competing

```
 1   tour.
 2              In the context of -- I mean, Your Honor has to
 3   remember LIV is entirely a creation of PIF.  PIF -- it didn't
 4   exist.  They created it.  So they're going to have -- PIF is
 5   going to have millions of communications relating to LIV.  They
 6   hired a bunch of third parties.  They hired banks.  They hired
 7   consultants.  And this request called for every communication
 8   with those consultants related to LIV.  Well, that's what PIF
 9   was doing.
10              What we're asking for from McKenna is -- who did not
11   create LIV, who is not going to have as many documents, is a
12   much smaller entity, as they like to remind us, than PIF, we're
13   asking for their communications related to the PGA Tour.
14   That's materially different than what was struck in -- by
15   Magistrate Judge van Keulen.
16              THE COURT:  And the period of time we're talking
17   about, right, is from October of '21 or beginning -- so, so
18   roughly you're talking about --
19              MR. DOOLEY:  18-19.
20              THE COURT:  -- communications over about 18 months?
21              MR. DOOLEY:  Yes.
22              MR. KRESS:  Yes, Your Honor.
23              MR. DOOLEY:  May I make just --
24              THE COURT:  Okay.
25              MR. DOOLEY:  -- a couple of other points just in
```

1    response on this one?

2            Just so the record is clear, the court has made

3    absolutely crystal clear in California that PIF and

4    communications with PIF and their actions are relevant to the

5    counterclaims and the defenses to LIV's claims, right?  The

6    court said that -- this is in the district court judge's ruling

7    affirming the magistrate judge -- the Court also finds that the

8    requested discovery to PIF is relevant both to the antitrust

9    claims and the Tour's defenses thereto and Tour's

10   counterclaims.

11           So there's no -- PIF is not cabined to the

12   counterclaims.

13           I also just want to be clear what we're talking about

14   here in Request 13.  I think you said it well:  communications

15   within the LIV world.  So this is -- we're looking for

16   McKenna's communications with PIF related to the Tour and

17   McKenna's communications related to any other third party that

18   was working on behalf of PIF or LIV.

19           So we know, for example, that McKenna communicated

20   with a well-known -- another well-known communications firm

21   about, about the Tour, and so those communications would be,

22   would be relevant and would be responsive.

23           So it's not everything, as Mr. Kress suggests.  It's

24   communications with PIF and with third parties retained by PIF

25   or LIV to the extent that those relate to the Tour.

1          And it doesn't include lobbying.  We've agreed to

2     that.  And so I think when you, when you get there and in light

3     of what I think Your Honor has recognized, which is McKenna's

4     work is entirely focused on the competition between LIV and the

5     Tour, I think this is a reasonable request.

6          THE COURT:  All right.  Anything else?  I'm prepared

7     to rule on this.

8          MR. KRESS:  Your Honor, I would only say that I

9     strongly suspect that anything related to the PGA Tour,

10    relating to is the flip side of a nickel when it comes to

11    relating to work with LIV about establishing a competing golf

12    tour.  So --

13         THE COURT:  I understand.  And I'll, I'll put a lot

14    more reasoning on the record at the end, but I just want to

15    make sure that the parties at least -- it's easier for me to

16    keep organized as we go.

17         I do agree with the PGA's Tour -- or the PGA's

18    position with respect to RFP 13.  It's not often that, that

19    there wouldn't be some tailoring of a -- of an RFP of this

20    nature, but I think given the facts of this case, given the

21    nature of McKenna's engagement, given the nature of the claims,

22    I think it is both relevant and proportional, and so I'll deny

23    the motion to quash with respect to 13.

24         MR. KRESS:  If I may just -- and I promise we

25    definitely want to move along, and I know you want to move

1   along, so all discussions here today, they've been saying "all

2   communications with."  The actual specification is "all

3   documents and communications with that relate to the

4   communications with."

5          Are we limiting it to actual communications with LIV

6   or PIF?

7          MR. DOOLEY:  May I be heard on that, Your Honor?

8          THE COURT:  Sure.

9          MR. DOOLEY:  Mr. Kress is, of course, right; that's

10   the language of Request 13.  The documents related to, I think,

11   relates to the fourth category in our opposition, which is the

12   internal McKenna documents.  I think we can talk about those

13   separately, but for purposes of your ruling, I think we can

14   limit this request, Request 13, to communications, and then we

15   can talk about internal -- a document related to a

16   communication would be something internal.

17          So this can be limited to the communications.

18          THE COURT:  Okay.  Thank you.

19          And I apologize to do this so quickly.  Could we just

20   take about a ten-minute recess?  It looks like I'm just going

21   to need to reschedule something for, for early this afternoon,

22   but if we could just take ten minutes, we'll come back and pick

23   up where we left off.  Thanks.

24          MR. DOOLEY:  Thank you.

25          (Recess from 11:00 a.m., until 11:16 a.m.)

42

1          THE COURT:  All right, Mr. Kress, what's up next?

2          MR. KRESS:  All right, Your Honor, thank you.  Up

3   next is this, I guess, broad category of public relations and

4   media strategy.

5          THE COURT:  Right.

6          MR. KRESS:  And I know we're trying to dig into

7   specific requests and not general topics, so if we -- I think

8   if we looked at their Requests 7 and 17, both of which they

9   cite in this category in their opposition brief as two of the

10  five or six on this topic, all documents related to media

11  campaigns, indirect campaigns, unattributed campaigns, targeted

12  at social media regarding PGA Tour, LIV, LIV's efforts to

13  establish a competing professional golf league, Saudi PIF, Golf

14  Saudi, the Kingdom of Saudi Arabia, Kingdom of Saudi Arabia's

15  human right records, DOJ investigation of the PGA Tour

16  allegations in this litigation, that's No. 7; and No. 17 is all

17  documents and communications related to any media, social

18  media, public affairs involving professional golfers, market

19  benefit of competition in professional golf, the PGA Tour, LIV,

20  Saudi PIF, or the Kingdom of Saudi Arabia.

21          So this is when we go back to they want all of our

22  external communications, all of our internal communications,

23  and now all documents and communications related to public

24  affairs and media strategy.  This is, frankly, just flat-out

25  fishing, Your Honor.  There's -- as I said before, there are

1    multiple ways that parties can compete, one of which is in the

2    court of public opinion.  There is no claim, there is no

3    defense, there is no counterclaim that sounds in defamation,

4    that sounds that we said mean things about them, whatever it

5    might be.

6               This is that they want to -- they want to sort of

7    cast aspersions about the Kingdom of Saudi Arabia, Kingdom of

8    Saudi Arabia human rights record.  This is, this is, frankly,

9    fishing.

10              So, you know, we are a media and public relations

11   firm in part.  So again, establishment of a competing golf

12   league, why would we want to turn over to PGA our sort of

13   strategy documents, media documents that say this is why

14   competition is good, this is why, you know, more golf is

15   better, more, more variety is better?

16              So -- anyway, we think it's pretty clear this is just

17   incredibly overbroad and not remotely relevant.

18              And again, to go back to the order, the actual order

19   on PIF from California, what are two of the things that are

20   struck?  Documents and communications related to potential

21   benefit to you, the Kingdom of Saudi Arabia, the Saudi Arabia

22   monarchy, hosting golf events or being associated with

23   professional documents.  Documents and communications related

24   to complaints, criticisms, negative opinions about LIV, you,

25   the Kingdom of Saudi Arabia, professional golfers participating

44

1    in LIV, or the Saudi Arabia monarchy.

2         Again, those are struck.  Now they want our documents

3    about including those topics on -- with the media.  There's,

4    there's no claim, there's no defense that relates in any way to

5    this.

6         Now, just briefly, I know that they're going to

7    mention Klout.  Klout was the PGA's essential PR strategy firm,

8    and LIV did seek discovery on that.  There was no order.  There

9    was no ruling.  Whatever got produced ended up getting worked

10   out.  We were not part of that.  We don't know anything about

11   it.

12        But more materially, we're just materially different

13   than Klout was in that case, and two primary reasons here, Your

14   Honor.  One is relevance.  What the PGA says -- and again, like

15   you said, catching smoke in a bottle, we've been trying to

16   catch smoke in a bottle for five months.

17        The only thing they've said in their papers is it

18   might show -- so somehow our media strategy, media -- social

19   media campaigns might show what particular third parties said

20   or didn't say about why they would do business with LIV.  It

21   doesn't even make any sense.  The fact that we might be

22   prepared to address, push back, related to, you know,

23   association with Kingdom of Saudi Arabia issues or human

24   rights, that's -- we're trying to compete.

25        That's not -- that has nothing to do with what third

45

1    parties say why or why they would not do business with us.  So

2    that's the only thing that PGA has argued.

3          The PGA keeps saying, well, their, their defense is

4    the monopolization claim, right?  So their defense to LIV's

5    claim is that there are legitimate business reasons that they

6    don't want to associate with golfers or sponsors or tournament

7    hosts who might associate with LIV because LIV is associated

8    with Saudi Arabia.

9          That's, that's their theory.  That's pretty

10   attenuated, but that's their theory.  So now we're not talking

11   about when LIV discovery of PGA, it would say, okay, you guys

12   are actually out there fomenting those concerns, that

13   association.

14         That's not at issue here.  Now they're saying, well,

15   we might try to defend ourselves from that.

16         That's not a claim.  That's not a defense.  It's

17   just -- it's just prurient curiosity, I think.

18         And the second thing, though, Your Honor, is need,

19   right?  So they have from, either from LIV from discovery or

20   from whatever is out there in the, in the realm, whatever the

21   actual media campaign is, whatever those, those documents or

22   strategies are, the difference -- and that's what Mr. McKenna

23   said in his declaration in part, right?  We're an agent.  If we

24   do something, we communicate regularly with our client.

25         On the Klout subpoena, it was very clear that the PGA

1   gave instructions to Klout to not share their work product with

2   PGA, to disassociate themselves with what was going on.  So

3   there's both difference on relevance and on need, Your Honor,

4   between us in that situation.

5          THE COURT:  All right, thank you.

6          MR. DOOLEY:  Thanks, Your Honor.  Let me try to

7   address Mr. Kress's point.  Before, before I forget, Your

8   Honor, one broader point that I did want to make at the

9   beginning, and this is as good a time to insert it as any, the

10  standard here is a finding of undue burden on the recipient of

11  the subpoena.  It's their -- they have the burden in this

12  proceeding to show that they would be unduly burdened by the

13  subpoena that we've served on them.

14         This doesn't go to this specific set of requests.  It

15  goes to the broader point.

16         There's no evidence in front of Your Honor of any

17  burden on McKenna at all.  They haven't told you how many

18  documents might be involved.  They haven't told you how many

19  people it would take to look for them.  They haven't shown you

20  how much time it would take.

21         We gave them -- we've identified three custodians,

22  and we gave them search terms.  They could have run those

23  search terms and come in here and said, Your Honor, we ran

24  these search terms, and it returns 250,000 documents, and now

25  we're going to have to review those, and that's a burden.

1          They didn't do that.  There's zero evidence before

2     Your Honor of any burden on McKenna.  And I just think as you

3     evaluate these last couple of requests, it's worth bearing that

4     in mind.

5          Arguably, there's no evidentiary basis to find an

6     undue burden because there's no evidence of any burden, but I

7     think in evaluating the relevance versus the burden, you've got

8     good arguments on relevance and zero arguments or evidence of

9     any burden to McKenna, and, of course, they're not paying for

10    it.

11         THE COURT:  But don't we have to -- I take your

12    point, they haven't necessarily made that argument, so there's

13    not necessarily an undue burden under the Rule 45(d) issue that

14    seems to be -- that seems to be a motivating issue here, but

15    we're still cabined in by 26(b), right?

16         MR. DOOLEY:  Absolutely.

17         THE COURT:  We still have that, okay.

18         MR. DOOLEY:  Absolutely.

19         THE COURT:  I think that's -- I think everybody's

20    sort of working off that, that same sheet of music.

21         MR. DOOLEY:  Well, I mean, but it goes a little bit

22    to this idea that, well, they're asking for everything.  I

23    mean, that's a breadth argument.  It's not really about

24    relevance.  It's about, well, that would require us to --

25         THE COURT:  Kind of a proportionality argument.

48

1            MR. DOOLEY:  Right.  And when there's no evidence of

2    what the actual burden would be, you can't really assess the

3    proportionality.  I mean, if they came in here and said their

4    request would, would require us to produce a million documents,

5    that would be evidence that you could weigh on the

6    proportionality aspect.

7            THE COURT:  I get that.

8            MR. DOOLEY:  I just --

9            THE COURT:  Correct, they're not making that

10   argument, but the proportionality, as I understand it, is

11   always that it has to be proportional to the needs of the case.

12           MR. DOOLEY:  Absolutely, Your Honor.

13           THE COURT:  Which always kind of brings us back to

14   that.

15           MR. DOOLEY:  Yeah, and I did -- let me now return.  I

16   just wanted to before I forgot that point, let me talk about

17   the request for, for media and the -- specifically, we can talk

18   about Request No. 7.  Four, four points here, I think.

19           First, the comparison to the Court's order modifying

20   our subpoena as to PIF is -- it's really apples to oranges,

21   Your Honor.  This was a request to PIF, which is the sovereign

22   wealth fund of Saudi Arabia, for documents related to the

23   actual or potential benefit to the Kingdom of Saudi Arabia of

24   hosting golf events or associating with professional golf and

25   document requests to the Kingdom of Saudi Arabia sovereign

1  wealth fund for documents related to complaints, criticism, or

2  negative opinions about PIF or about Kingdom of Saudi Arabia.

3         That's very different.  That's a much broader request

4  to a much bigger entity that has many -- I mean, the sovereign

5  wealth fund invests in hundreds of businesses around the world,

6  and so arguably, that -- this was a -- is a much broader

7  request than what we're talking about here, where, Your Honor,

8  we know from the work order -- and this goes to -- this is my

9  second point.  This is not anything close to a fishing

10  expedition, Your Honor.

11         We have, and it's Exhibit 12 to Mr. Phung's

12  declaration, the work order, and it's under seal, so I'm not

13  going to read it, but --

14         THE COURT:  You can summarize.  I have a copy, and

15  I've read it.

16         MR. DOOLEY:  Yeah.

17         THE COURT:  I understand.

18         MR. DOOLEY:  I mean, you can go through it, and it

19  describes -- and there's -- McKenna has never denied that

20  they've done all the things that are described there, and it

21  walks through specific tasks that, that LIV gave to McKenna

22  regarding promoting its image and attacking the Tour's image.

23  It's, it's all in there, so there's -- this isn't a fishing

24  expedition.  This happened.  We know it happened.  They have

25  never denied that it happened.  They've never denied that they

1    did this work.  So it's not a fishing expedition.

2         And furthermore, just -- if you look at some of the

3    exhibits we attached, you look at Exhibit 27, that's

4    Mr. McKenna being involved in an urgent communications call;

5    Exhibit 28, he's called upon to craft a response when the LIV

6    executives leave; Exhibit 29, he's providing background to the

7    press about, about PIF and about LIV; Exhibit 30, he's creating

8    a narrative about independent contractors and, and the Tour.

9         He's responsible for -- this is Exhibit 23 --

10   securing op-eds and friendly reporters.

11        So this isn't a fishing expedition.  We know they've

12   done this work.  The question now is, is it relevant, and I'll

13   tell you why it's relevant.  There's three reasons.

14        First, the reputation of LIV is part of our defense

15   to the claim that we've gone out and threatened businesses and

16   we've threatened the, the Augusta National and we've twisted

17   arms and we've threatened sponsors.  It's all the things that I

18   read you in paragraph 11 of the amended complaint, all the

19   threats and arm twisting and leaning -- that's the word they

20   use -- leaning.

21        The Tour's defense to that in part, well, it didn't

22   happen, but also, to the extent that any tournament host or

23   vendor didn't want to work with LIV, the reason is they don't

24   want to be associated with LIV's reputation.  They don't want

25   to be associated with the Kingdom of Saudi Arabia's human

1    rights record.  They don't want to be associated with PIF.

2           So McKenna's work -- what did Mr. Kress say? --

3    putting LIV in a positive light, their media campaigns, their

4    assessment of, of LIV's -- the public's perception of LIV

5    directly supports the Tour's position that the reason that

6    businesses aren't work with LIV, to the extent they're not, has

7    nothing to do with the Tour and everything to do with LIV.

8           That's the first reason why the -- LIV's reputation,

9    which is what they were trying to polish, and which they were

10   assessing and analyzing and putting together PowerPoints and

11   plans, it's relevant to that defense.

12          Second, it's relevant to our pro-competitive

13   justification for our regulations.  LIV says you've got these

14   regulations that don't allow Tour members to take a weekend off

15   and play for LIV in a conflicting event.  That's

16   anticompetitive.

17          We say it's not anticompetitive.  We don't want our

18   members going and playing with LIV and then coming back and

19   bringing the association of LIV and its reputation to our

20   event.  That discourages us from investing in our product, in

21   improving our product.  That's a pro-competitive justification,

22   and, and the justification ties to LIV's reputation and what

23   the public thinks of LIV, which is exactly what McKenna was

24   tasked with assessing and with improving.

25          Third, Mr. Kress said that there's no claim or

52

1  defense that relates to PR campaigns or Klout.  That's just not

2  true, Your Honor.  It's just not -- I wish it was true.

3          THE COURT:  I'm sorry, could you -- I'm sorry, I just

4  missed the last -- could you just repeat that last sentence?

5          MR. DOOLEY:  Sure.  So Mr. Kress said -- this is the

6  third reason why LIV's reputation and McKenna's work polishing

7  that reputation is relevant.  Mr. Kress said that there's no

8  claim that relates to public relations work or how LIV is

9  perceived or how the Tour is perceived.

10          That's not true, and we cite this in, it's Exhibit 4

11  to Mr. Phung's declaration.  It's a motion that LIV filed, and

12  their allegation is that we've -- that the Tour has engaged in

13  anticompetitive conduct by going -- by hiring a PR company,

14  this company Klout, and fomenting -- that was Mr. Kress's

15  word -- fomenting anti-LIV sentiment.

16          Essentially, LIV's position is there's no real

17  anti-LIV sentiment.  It's all been created by the Tour.

18  That's -- and that's anticompetitive.  The Tour has gone out

19  and behaved improperly and hired a PR company and kicked up all

20  this dust, and it's all fake.  It's fake news is the sort of

21  the argument, I guess.

22          And their -- evidence from McKenna that, in fact,

23  there is a public perception, a negative public perception

24  attached to LIV, is directly relevant to refuting that claim.

25          Our argument is no, the public is legitimate- --

53

1   public and business are legitimately concerned about being

2   associated with LIV, and that explains to the extent that

3   they're having trouble getting tournament sites, which I don't

4   think they are but that's what they say, the reason is their

5   reputation and the reputation of their sponsor, the Kingdom of

6   Saudi Arabia.

7          So we should be able to get this evidence that

8   McKenna has, that we know they have, they haven't disputed that

9   they have it, analyzing, assessing, and, and burnishing LIV's

10  reputation, and that's what the requests call for.  The

11  requests are just quotes from the work order, right?  And we're

12  asking for the work they did.

13         Request 7, which Mr. Kress quoted from, it just

14  quotes the work order, right?  We say documents and

15  communications related to media campaigns, including indirect

16  campaigns, unattributed campaigns, targeted and anonymized

17  social media campaigns.  So we're just asking for the work that

18  they did pursuant to the work order.

19         THE COURT:  But doesn't -- I understand how you came

20  up with that language, but just because it comes from the work

21  order doesn't mean that it's tailored to the issues in this

22  case, right?

23         MR. DOOLEY:  I understand that, and I -- what I'm --

24  perhaps I wasn't persuasive or clear, but I'm trying to

25  explain, Your Honor, our view as to what --

54

1          THE COURT:  No, I understand.  I understand.  The --

2   all right.  Did you want to respond?

3          MR. DOOLEY:  Can I make one more point, Your Honor?

4          THE COURT:  Please.  Absolutely.

5          MR. DOOLEY:  The last point.  My fourth point was

6   Mr. Kress suggested at the end that his last point was there's

7   no need for this because whatever McKenna did is out in the

8   public.  Whatever public relations work they did, we can just

9   get it that way.

10          But, of course, if you look at the language of the

11  work order, there's a lot of language suggesting unattributed

12  campaigns, kind of covert campaigns that aren't attributed to

13  anybody, so there'd be no way we'd be able to find that except

14  for getting the documents from McKenna.

15          THE COURT:  That's fine.  I'm sorry, before

16  Mr. Kress, if I can just ask you just, Mr. Dooley, just one or

17  two quick questions, so with respect to your first point,

18  that -- let's assume for the sake of argument, and, you know,

19  maybe I'm jumping into, you know, a pond that I just don't need

20  to be in at the moment, but reputational issues are going to be

21  hard to prove, right?  I mean, it's a -- you know, it's -- that

22  is not an easy thing for any judge or jury to get their arms

23  around with any degree of certainty, right?

24          So let's say for the sake of argument that I accept

25  your, your notion that it's still, it's still important in this

1   case, right, still an issue in this case, right, for any number

2   of reasons, and, and one of the issues, as you pointed out, is

3   are there vendors, you know, in sort of a large sort of

4   encapsulating a lot of different vaults, right, are there golf

5   courses, are there, you know, merchandise made, anybody, right,

6   who could support a tour who refused to work with LIV because

7   they expressed some concern about reputational damage, right?

8           Couldn't there be an RFP that's narrowly tailored to

9   that point?

10          MR. DOOLEY:  Yes, there could be.  Yes.

11          THE COURT:  Do they have records or documents from

12  which a -- in which a, a -- any third party, any vendor said --

13  relayed to them that they don't want to be, or that, you know,

14  they're refusing their outreach, they don't want to be

15  associated with LIV, and the reason they don't want to be

16  associated with LIV is for reputational reasons, the same

17  reason that you're asserting here?

18          Is that, is that -- first of all, let me ask

19  Mr. Kress, is that something you-all would object to?

20          MR. KRESS:  Not only is it not something we'd object

21  to; that was our first topic today.  We agreed to do that

22  before we came here.

23          THE COURT:  Okay.

24          MR. KRESS:  For that exact reason.

25          THE COURT:  So does, does that serve your purpose?

1    And if not, why not?

2            MR. DOOLEY:  Sure.  So that is absolutely relevant,

3    and those documents -- it's not hypothetical.  Those documents

4    exist.  We've attached some of them as, as exhibits,

5    communications in which Mr. McKenna was sent out to deal with

6    vendors who were concerned about doing business with LIV

7    because of their connections to the Saudis.  So it's not

8    hypothetical.  It is relevant.

9            It's not sufficient, though, because it goes beyond

10   individual vendors expressing their concern.  McKenna was hired

11   on a broader task, right, to formulate strategies,

12   communication strategies to put, in Mr. Kress's words, to put

13   LIV in a positive light, so there's -- there's presentations.

14   There's work product analyzing what the, what the public's

15   perception is of LIV, and so it's not just a particular vendor.

16   It's surveys.  It's analysis of what people are saying.  It's

17   all the things that communications professionals do.

18           So it's broader than just an individual vendor or an

19   individual third party refusing to do business.  I agree,

20   that's covered by our previous discussion, but I think it's

21   broader -- there are more documents that are relevant to our

22   defenses --

23           THE COURT:  So if they have, you know, if they have

24   polling, you know -- I'm just making this up; I have no idea.

25   You know, if they have documents in there that say in our

57

1   assessment, right, LIV suffers from the following reputational

2   issues --

3            MR. DOOLEY:  It's absolutely relevant to this case.

4            THE COURT:  Why?

5            MR. DOOLEY:  Why?  Because it's, it's a couple of

6   things.  It's the things -- it's -- it proves the broader point

7   that the difficulty that LIV is having with respect to gaining

8   traction in the market has nothing to do with the Tour.  It's

9   its own problems because of its funder.  That's, that's No. 1.

10            No. 2, it's relevant to the Tour's justification for

11   why it's enforcing its regulations to, to its conflicting

12   events regulations so that -- because the Tour doesn't want its

13   members on a weekend when there's a Tour event going over and

14   playing with LIV to make it look like the Tour approves of LIV

15   and that the players come back and then there's a, there's an

16   association between the two.

17            The Tour has spent 50-plus years developing a

18   reputation, and it has the right to protect that reputation,

19   and allowing players to violate the conflicting events rule by

20   playing in the -- in LIV would --

21            THE COURT:  Now, do you think we are getting to the

22   point where, where -- and I do believe and I, and I think you

23   agree, and we discussed probably this maybe to some degree that

24   maybe this is not a typical nonparty, right?  But I do think

25   we're getting to the point where you're using a nonparty.  I

58

1    think we're getting to the outer boundaries of what we can

2    expect from a nonparty.

3              MR. DOOLEY:  If I might respond to that, Your Honor?

4              THE COURT:  Please.

5              MR. DOOLEY:  They're certainly not a typical

6    nonparty.  We all agree on that.  Here the Tour has out- -- or

7    LIV, rather, has outsourced this work of assessing its

8    reputation, polishing its reputation, they've outsourced that

9    work to McKenna, and so we can't get the documents from -- I

10   mean, we can get what we can get from LIV, but we know that

11   McKenna has done all this work on LIV's reputation.  They don't

12   deny that.  And that reputational work is, is absolutely

13   relevant.

14             Now, if, you know, if the Court wanted to narrow

15   the --

16             THE COURT:  I think that's where we're going to have

17   to go.

18             MR. DOOLEY:  Okay.

19             THE COURT:  You know, I'll tell you at least where my

20   head is right now.

21             MR. DOOLEY:  Okay.

22             THE COURT:  I just don't think they should have to

23   turn over their entire media strategy or media efforts, right?

24             MR. DOOLEY:  Sure.

25             THE COURT:  I just think that's -- I think that's

59

 1    just way too broad.

 2              MR. DOOLEY:  Okay.

 3              THE COURT:  And I'm assuming that as part of a media

 4    effort, as you've indicated, they're, you know, they're using a

 5    reference to put out positive stories or positive images of LIV

 6    and perhaps negative images or negative stories of the PGA,

 7    right?  And I think everybody is kind of assuming that's what

 8    Klout did, that's what, you know, McKenna did.  I mean,

 9    they're -- that's the nature in some degree of what they were

10    hired to do.

11              But I think we need to somehow -- I think we need to

12    somehow narrow the parameters to make it --

13              MR. DOOLEY:  Sure.

14              THE COURT:  -- linear to what matters.

15              And if your -- and if your other points are with

16    respect to the reputational damage that the Tour would suffer

17    if players under contract to the Tour were engaged in both or

18    playing on both tours, right, I'm not sure that's something

19    that PGA just isn't going to have to figure out for themselves,

20    right?

21              I'm not sure how going to McKenna -- you know, if the

22    PGA is -- if the PGA's position is we don't want our Tour

23    somehow tainted, right -- and I'm not making any commentary

24    about whether it's a good argument, bad argument --

25              MR. DOOLEY:  Sure.  That's the argument, yeah.

60

1          THE COURT:  -- whether there was any reputational

2   arguments there or any damage, I'm not making any comment about

3   that.  I mean, this is just sort of, you know, just within the

4   discovery context, right?

5          Why are we putting that burden on a nonparty rather

6   than having the PGA responsible for, for figuring that out?

7          And admittedly, it's a hard thing to, to bring

8   together in an evidentiary forum.

9          MR. DOOLEY:  Absolutely.  The reason why we're coming

10  to McKenna is because we know that LIV hired them to do this

11  work.  They have never disputed that they did the work, and

12  it's -- they've been paid handsomely to do it.  That's also

13  never been disputed.

14         So it's, it's a source of information -- it's

15  essentially a -- they're also an agent of LIV, right?  It's an

16  admission by LIV -- any work that they've done is LIV's

17  analysis, their analysis of LIV's own reputation, so it's if we

18  do the work, LIV can attack it.

19         If it's LIV's work that they hired, assess what our

20  reputation is.  Work on our reputation.

21         THE COURT:  Why isn't this more analogous to, like,

22  you know, competing experts, right?  You have your experts from

23  Klout, they have their experts in McKenna, and, you know, one

24  side can say here's where -- you know, here's where we view our

25  reputation or our issues, here's our information how they view

61

1   their, you know, both good and bad.  Why isn't this ultimately,

2   to the extent that it's relevant, to the extent that it's

3   admissible, why isn't this more analogous to just competing

4   experts?

5          MR. DOOLEY:  Well, in some senses, I don't think

6   that's a bad analogy.  I mean, they -- and in the context of

7   competing experts, you would get discovery from the experts on

8   the basis of their opinions and, and their work and their prior

9   opinions, and so you could assess it.  That's what we're, we're

10  after.

11         Let me suggest a compromise here which would narrow

12  this, which is we would live with a request -- we think that

13  their efforts to paint the Tour in a negative light and to

14  paint LIV in a positive light, we think those planting stories,

15  all the things that are described in the work order, we think

16  all that's relevant, but we would live with a request that went

17  to documents related to the reputation or public perception of

18  LIV, PIF, or the Kingdom of Saudi Arabia in their possession.

19         So if they've got documents that reflect analysis,

20  surveys, whatever they've done of the public reputation, the

21  public perception of LIV, PIF, or Saudi Arabia, that will serve

22  our purpose much, much narrower, and I have no doubt that they

23  have them.

24         THE COURT:  And you can't get this from the parties

25  because?

62

1           MR. DOOLEY:  Because --

2           THE COURT:  -- because of the stay?

3           MR. DOOLEY:  I mean, we've certainly asked for it

4   from LIV, but LIV paid them to do this work.  They're the,

5   they're the ones that did the work for LIV, to do the

6   assessment, to do the analysis, and --

7           THE COURT:  Are you suggesting that they, they have

8   information that they would not have passed on to LIV?

9           MR. DOOLEY:  Well, to the extent that they do, yes.

10  We, we think that that's relevant.  Internal summary, I mean,

11  this gets a little bit to the internal documents, but --

12          THE COURT:  Which we'll get to.

13          MR. DOOLEY:  -- internal summaries of conversations.

14  I talked to so-and-so, and he or she said this about LIV's

15  reputation.

16          THE COURT:  Okay.  All right, I think Mr. Kress is

17  chomping at the bit.

18          MR. KRESS:  I am, Your Honor.  Just, just very

19  briefly, I promise very briefly, I think you start to see what

20  we get at.  It's five months, and like you said earlier,

21  grasping at smoke.  The only argument they've said is that it

22  might show what third parties may or may not have done business

23  with LIV because of reputational concerns.

24          We've already agreed to give them that.  This is now

25  get ready to do air cover in case someone raises issue X, Y, or

63

1  Z.  This is what I mean by fishing.  Basically, there might be

2  something in there, I guess, but that's not what discovery is,

3  certainly not what tailored third-party discovery is.

4          THE COURT:  What about the issue that there should be

5  some balance, right?  And I understand that, you know, Klout

6  may be, you know, may be in a little bit of a different

7  perspective, but if, if reputation is going to be an issue, if

8  it is going to be an issue with respect to -- and I, and I

9  think I understand Mr. Dooley correctly -- that part of the

10 Tour's argument may be, you know, LIV struggled -- and I have

11 no idea if LIV is or is not struggling -- but to whatever

12 extent, that they were struggling not because of any

13 anticompetitive behavior on the part of -- on behalf of the

14 Tour, but because of this other independent reason because

15 there were reputational reasons, right?

16         MR. KRESS:  Okay.

17         THE COURT:  And it's -- and LIV's position is that

18 the -- that to the extent that there are reputational issues,

19 that's part and parcel of the PGA's efforts to plant -- or to,

20 or to, you know, affirmatively attack LIV's reputation in some

21 way, shape, or form, or the Kingdom of Saudi Arabia's

22 reputation, or link the two or whatever.

23         So if, if it is an issue that's joined, why shouldn't

24 there be some balance in terms of you have the Klout

25 information, they have the McKenna information, and I suppose,

1    you know, Mr. Dooley is right, to the extent that I threw out

2    the dueling experts argument, you know, everybody gets a peek

3    under the hood of the other expert, so why would there not be

4    some balance there?

5            MR. KRESS:  Sure.  Sure, Your Honor.  So a couple

6    things.  One is -- and again, this is sort of what they're

7    saying.  So it's not a claim.  It's not a defense.  It is

8    potentially relevant to a response to their defense, so that

9    there's a big difference to that.

10           THE COURT:  Well, I think they say it is a defense.

11           MR. KRESS:  No, no.  Their defense is that they don't

12   want people associated with LIV to also be associated with the

13   Tour, right?  And so we believe, and that was what the PGA --

14   excuse me, not we, PGA -- excuse me, LIV -- that was the LIV

15   discovery on Klout.

16           Klout stirred that up, fomented those concerns,

17   right?  That's their business justification.

18           Here we're talking about if we then put out press or

19   social media to say, you know, see LIV in a good light, it's

20   good for competition, you can read the work order.  The work

21   order is not scandalous.  It's like put us in a positive light.

22   Promote the benefits of competition.  More golf work.

23           How is that relevant to their case?  It's just

24   their's is a specific defense; we agree with that; but our --

25   there's nothing they're pointing to here.  They're just saying

1   they want it all because there might be something there that

2   bears on third parties.

3          This is actually the first time we've even heard this

4   argument.  Before, in the brief, it's, you know, it might show

5   why third parties didn't do business with us.  I don't -- as

6   you said earlier, I don't think that's the case, but we've

7   already given them that.

8          THE COURT:  But I thought there was an argument too,

9   which is, you know, why LIV wasn't successful was not because

10  of conduct the PGA has done but because of other, other issues

11  independent of the PGA and potentially if, if LIV prevails on

12  liability, maybe potentially with respect to damages.

13         MR. KRESS:  I think we're -- I just think we're three

14  degrees of attenuation sort of at least now.  Our efforts to

15  arguably respond to their efforts to, you know, to attack us,

16  so --

17         THE COURT:  Well, again, I think this is -- I'm kind

18  of swimming in somebody else's pond.

19         MR. KRESS:  I understand, Your Honor.

20         THE COURT:  And I understand that's -- but, you know,

21  I'm not entirely sure or I'd be highly skeptical that the whole

22  reputation issue is going to drive the verdict in this case --

23         MR. KRESS:  I agree with that too, Your Honor.

24         THE COURT:  -- or is going to drive the result in

25  this case.

1          MR. KRESS:  In fact, in fact, Mr. Dooley earlier read

2     about 11 paragraphs of claims that he's saying show how broad

3     it was.  None of this is even in there, what he read.

4          So, I mean, we are, we are definitely swimming on the

5     edges, as you said earlier.

6          THE COURT:  Well, Mr. Dooley, how can we narrow --

7     again, I think we just need to come up with some language that

8     is a little more tailored to your specific needs on this point,

9     right?  I don't think that it's appropriate to order a nonparty

10    to open up their entire media efforts.

11         MR. DOOLEY:  And I, and I hear you, Your Honor, and I

12    hear the point about, you know, public relations on, on the

13    benefits of competition.  Really we are willing to live with a

14    narrow request that calls for documents related to or

15    reflecting LIV's -- let me say it again -- documents reflecting

16    the public reputation or public perception of LIV, the PIF, or

17    the Kingdom of Saudi Arabia.

18         So documents that they have that, that reflect

19    research or documentation, surveys, whatever they've collected

20    that shows what the public thinks of LIV or the Kingdom of

21    Saudi Arabia or the Public Investment Fund, we'll live with

22    that.  That's, that's -- they have it.

23         THE COURT:  Why isn't that reasonable, Mr. -- you

24    know, under the circumstances?  So in other words, if there

25    is -- and I think this protects McKenna from the standpoint of,

1    you know, you're not going to have to disclose your media

2    strategy.  You're not going to have to disclose, you know, any

3    of your, I think, internal work product to a degree on that,

4    but if you have -- if you have documents -- again, it could be

5    polling; it could be whatever -- that indicate or that narrow

6    issue with that degree of certainty, then I do think that's

7    reasonable to provide in discovery, and I suspect it would be a

8    very small subset of what you ultimately have.

9            MR. KRESS:  Your Honor, we -- we'll agree with that.

10   And just to be clear, though, because I think the way you said

11   it I liked better, so it can't be like all documents relating

12   to, but if we do analysis, if we do polls, if we do a survey,

13   first of all, we would have communicated those with our client,

14   so we will have already captured that, which (inaudible), but

15   we'll give those actual analysis and strategy and -- or

16   whatever you're saying that the -- the categories you said.

17           I'm a little concerned when you say all documents

18   related to.

19           THE COURT:  Well, let's come up --

20           MR. KRESS:  It's a PR firm.  I mean, that's --

21           THE COURT:  Well, let's come up with some language.

22           MR. KRESS:  Right.

23           THE COURT:  If you came up with any documents that

24   incorporated any data, any analysis.

25           MR. DOOLEY:  May I suggest a word, Your Honor?  The

1   word that I would use is "reflective."  I mean, so a document

2   that itself describes the public perception or the public

3   reputation of LIV, therefore, the KSA, that's what we're

4   looking for.

5           THE COURT:  How about "incorporates"?  How about any

6   document that incorporates any data, any analysis, any

7   conclusions drawn regarding the reputation or the parties that

8   it, you know, the parties that you named?

9           MR. DOOLEY:  That's fine, Your Honor.

10          THE COURT:  I think that's -- I think that gets us

11  where we need to be.

12          MR. DOOLEY:  Absolutely.

13          THE COURT:  Okay.  Any heartburn over that,

14  Mr. Kress?

15          MR. KRESS:  No, Your Honor.

16          THE COURT:  Okay.  Okay.

17          MR. KRESS:  Okay.  Great progress.

18          The last one.  Again, we've had any communications

19  with external shareholders, any communications with internal

20  stakeholders, all internal media strategy.  And then the last

21  category that they use is every internal document on any of

22  those documents.

23          I don't even know where to start.  That's the

24  definition of fishing.

25          THE COURT:  Well, let's start with Mr. Dooley.

1   Why -- you know, I guess there are a couple of issues here we

2   need to wrestle.  Number one is I'm assuming that really what

3   would be at issue would be internal documents that for whatever

4   reason were not relayed to LIV.

5           MR. DOOLEY:  Correct.

6           THE COURT:  Right?

7           MR. DOOLEY:  Anything sent to LIV we're not asking

8   for.

9           THE COURT:  Right.

10          MR. KRESS:  So, I'm sorry, just to be clear, they're

11  asking for it because we've already agreed to give it to them.

12          THE COURT:  I understand.  I understand.  I'm just,

13  I'm just trying to --

14          MR. DOOLEY:  We're talking about this request doesn't

15  ask for it.

16          THE COURT:  Yeah.  So, so walk me through why their

17  internal deliberations --

18          MR. DOOLEY:  Sure.

19          THE COURT:  -- drafts of documents --

20          MR. DOOLEY:  Sure.

21          THE COURT:  -- why is that likely to, to result in

22  valuable information --

23          MR. DOOLEY:  Right.

24          THE COURT:  -- to you?

25          MR. DOOLEY:  The principal, the principal reason that

70

1    internal communications are relevant -- and we're not asking

2    for all internal communications.  We're asking for internal

3    communications regarding player solicitation, contracts and

4    compensation, internal communications relating to discussions

5    with golf stakeholders, internal communications related to the

6    topic we just talked about, and internal communications related

7    to, to PIF.

8           What we're looking for are internal communications

9    that reflect oral communications with PIF, with other third

10   parties, with LIV.  So in other words, I don't really care what

11   McKenna's opinion about something is.  I don't really care

12   about their drafts so much.

13          What I'm interested in is do they have -- are there

14   internal communications that say I spoke with PIF -- there's no

15   email.  I spoke with PIF today, and I spoke with

16   Mr. Al-Ramayyan, and here's what we need to do on player

17   solicitation.

18          That's indisputably relevant to the case.  It's not

19   something we can capture without getting those internal

20   communications, and they probably have them.  We don't know

21   because we don't have their internal documents.

22          So I'm happy to limit this to internal communications

23   that reflect oral communications with PIF, LIV, or other third

24   parties regarding the topics we've already talked about today.

25          THE COURT:  And let's just go through them and

1    memorialize them, just so I'm clear.

2           MR. DOOLEY:  Sure.  So you're asking me to craft a

3    document request off the top of my head, but I --

4           THE COURT:  On the fly.

5           MR. DOOLEY:  I think I can do it.

6           THE COURT:  I have total confidence that you can do

7    it.

8           MR. DOOLEY:  We're asking for internal communications

9    and correspondence that reflects -- will reflect discussions

10   with, with LIV, PIF, or third parties regarding, one, player

11   solicitation, contracts, and compensation; two, discussions

12   with golf stakeholders such as sponsors, vendors, tournament

13   hosts; three, McKenna's analysis of the public perception or

14   public reputation of LIV, PIF, and the Kingdom of Saudi Arabia;

15   and four, the PGA Tour.

16          So we're looking for internal documents that reflect

17   communications with three entities regarding four topics, all

18   of which we've gone through the relevance of.

19          THE COURT:  Well, the PGA Tour is basically asking

20   for everything, right?  I mean, I can't imagine in some way,

21   shape, or form, given the nature of a work order, that every

22   communication is not going to relate to --

23          MR. DOOLEY:  Sure.  So we can make that narrower

24   then.  Then the fourth will be reflecting internal -- internal

25   correspondence reflecting communications with PIF, LIV, or

72

1    other third parties regarding discussions with PIF about the

2    PGA Tour.  That's what we decided on on the PIF topic.

3              So internal correspondence that says I communicated

4    with, with Mr. Al-Ramayyan or Mr. Foster or -- about the PGA

5    Tour, and here's what he said.

6              THE COURT:  I'm sorry, could you repeat one more time

7    how you wanted to limit No. 4, how you wanted to narrow it?

8              MR. DOOLEY:  Sure.  So I'll probably not do this

9    exactly the same way I did it before, but we're looking for

10   internal documents that reflect communications -- we'll even

11   make it more specific -- documents that reflect nonwritten

12   communications with PIF, LIV, or a third -- other third --

13             THE COURT:  No, I got that part.  I'm sorry, just --

14             MR. DOOLEY:  Yep.  And then relating to, one, player

15   solicitation contracts --

16             THE COURT:  I got the first three.  I just need what

17   you said --

18             MR. DOOLEY:  You just need the last one.

19             THE COURT:  Yes.

20             MR. DOOLEY:  The fourth is discussions with PIF

21   relating to the PGA Tour.

22             THE COURT:  Right, okay.

23             And, and just briefly walk me through again why these

24   internal discussions of a nonparty are --

25             MR. DOOLEY:  Right.

73

1          THE COURT:  -- given, given all -- given the fact

2   that you have all the communications with their client.

3          MR. DOOLEY:  Yeah, I -- we're not interested in all

4   internal communications.  So --

5          THE COURT:  Just -- I gotcha.

6          MR. DOOLEY:  Yeah.  So, so if Mr. McKenna is talking

7   to I think it's Ms. Gallagher about just strategizing, we don't

8   want that, but what we need are internal communications that

9   reflect oral communications on the topics that we've already

10  determined are relevant.  So if there's an internal email from

11  Mr. McKenna that says I spoke to Broadcaster X today, and

12  Broadcaster X said, sorry, we can't, we can't strike a deal

13  with LIV because we can't take the PR hit --

14         THE COURT:  So essentially, you're saying that

15  this -- you're just trying to -- and I don't want to put words

16  in your mouth, but you're just trying to fill a potential gap,

17  right?  If there is not -- if there is some relevant

18  communication but that communication was not in written form,

19  either email or some other form --

20         MR. DOOLEY:  Right.  Exactly.

21         THE COURT:  -- you're just trying to identify was

22  there a phone conversation --

23         MR. DOOLEY:  Exactly.

24         THE COURT:  -- that covered one of the areas that

25  we've already ruled on.

74

1          MR. DOOLEY:  Exactly.

2          THE COURT:  So -- all right.  I think that that's,

3   honestly, that's an important fact that was kind of lost on me.

4   So if this is limited to internal communications that, that on

5   their face identify a conversation, an oral conversation on a

6   topic that we've already deemed discoverable, what's wrong with

7   that?

8          MR. KRESS:  I don't know there's anything wrong with

9   it, Your Honor.  I still struggle with Item 4 on the PGA Tour

10  part of it, but Item 3 --

11         THE COURT:  Well, we're going to -- we're going to go

12  back and we're going to tailor it --

13         MR. KRESS:  Okay.

14         THE COURT:  -- to what we've already ruled.

15         MR. KRESS:  Okay.  So yes, so the one thing I would

16  say is Item 3, any internal discussion of McKenna's analysis of

17  public, that one, I think we just dealt with that previously.

18         THE COURT:  Well, we're going to make sure everything

19  is consistent.

20         MR. KRESS:  No, no, I know, but I think we just dealt

21  with that one previously, and that was internal work product,

22  and now we're talking about communications that relate to it.

23  I thought we were going to actually give the actual documents

24  incorporating --

25         THE COURT:  We are.

1          MR. KRESS:  Okay.

2          THE COURT:  We are.  I gotcha.

3          MR. KRESS:  So this one -- that's the one.

4          THE COURT:  I'm not worried -- I'm not worried about

5     No. 3.

6          MR. KRESS:  Okay.  That's --

7          THE COURT:  I think, I think if -- as I ruled before,

8     I do think with respect to -- that's kind of a data-driven, you

9     know -- you know, I think if they have -- I think what's

10    important to you is if they have documents, if they have

11    something where there was some analysis done, where there was,

12    you know -- and it's incorporated in a document, right, but I

13    think here, you know, to your point, if you're trying to say

14    was there a phone call and that phone call, we talked about how

15    we're going to, you know, recruit Player X from the Tour -- or

16    from LIV to the Tour or whatever --

17         MR. KRESS:  Right.

18         THE COURT:  -- vice versa, right, I'm totally on

19    board with you.

20         MR. KRESS:  And we agree with that.

21         THE COURT:  Yeah.

22         MR. KRESS:  We have no issue with that.

23         THE COURT:  But I, but I think that, that, you know,

24    if there was a phone call and somebody says -- I think, I think

25    we need to be -- we need to be concrete, and we need to be

76

1    consistent.

2           So, I mean, I'm with you in terms of if there are

3    internal communications that on their face reflect an oral

4    conversation regarding player solicitation, player contracts,

5    player compensation --

6           MR. KRESS:  Right.

7           THE COURT:  -- I think that's, that's properly

8    discoverable.

9           MR. KRESS:  Agreed, Your Honor.  And we would go

10   further and agree with what we said earlier on golf

11   stakeholders.  If it's tournament hosts, vendors, sponsors,

12   equipment suppliers, I mean, broadcasters, those discrete

13   things they mentioned before, again, that's, that's fine.

14   That's doable for us.

15          THE COURT:  Great.  So we have Category 1 and 2

16   satisfied.  Category 3, I think, is -- I don't think falls

17   under this.  Category 4 just seems like a broad catch-all.

18          MR. DOOLEY:  May I address that?

19          THE COURT:  Please.

20          MR. DOOLEY:  I just want to be cognizant of the

21   direction to speak from the podium.

22          Category 4 is internal -- is, is really the mirror of

23   what we talked about when we talked about PIF.

24   Communications -- Category 4 here is internal communications

25   that reflect oral discussions with PIF regarding the PGA Tour.

1  So if there's an email that says I just got off the phone with

2  whomever at PIF or I was just at a meeting and here's what was

3  discussed, that's relevant, and that's what we want for this

4  fourth category.

5          THE COURT:  Well, I'm not sure if I was at a meeting

6  and here's what was discussed would probably suffice, right?  I

7  mean, I think the purpose of this is to, is to identify

8  properly for you a universe of communications that you would

9  have a right to pursue further, right?  Because you don't

10  know -- if there is a -- if there is a communication that

11  reflects an oral conversation about a topic that we've deemed

12  is properly discoverable, you wouldn't know that --

13          MR. DOOLEY:  Right.

14          THE COURT:  -- unless, unless they provide these

15  communications.

16          That, I think, is the goal here.

17          MR. DOOLEY:  Yes.

18          THE COURT:  Right?

19          MR. DOOLEY:  And I think the substance, we wouldn't

20  know the substance of discussions at a meeting, and if there's

21  a document that says here's what was discussed, that's a

22  summary of an oral communication I think would be covered by

23  this.  With those -- the way you've described it, Your Honor,

24  we're satisfied with that.

25          THE COURT:  Do you have any objection to that?

78

1              MR. KRESS:  As long as we stick with it's related to
2    the PGA Tour, right, because that was the -- that was the
3    overarching area.  It's not relating to LIV.  It's not related
4    to establishment of a competing tour.  It's not related to the
5    Kingdom of Saudi Arabia.  It's related to the PGA Tour.  Then
6    we're fine, Your Honor.
7              THE COURT:  All right.  I think we have an agreement.
8    All right, good.  Good.
9              MR. DOOLEY:  Thank you very much, Your Honor.
10             THE COURT:  Did I miss anything?
11             MR. KRESS:  No, Your Honor.
12             MR. DOOLEY:  No.
13             THE COURT:  Is there, is there anything else that
14   you-all think that, that we need to wrestle with about this?
15             MR. DOOLEY:  Nothing from our end.  And again,
16   thank you, Your Honor, for your patience in working through
17   this.
18             THE COURT:  Happy to do it.
19             MR. KRESS:  Agreed.  Nothing from our end, and thank
20   you for your patience.
21             THE COURT:  Well, it's an interesting case.  I'll be
22   looking forward to following it from the cheap seats.
23             All right, you-all have a nice day.  Thank you.
24             MR. KRESS:  Thank you.
25             MR. DOOLEY:  Thank you.

79

1                    (Which were all the proceedings

2                     had at this time.)

3

4            CERTIFICATE OF THE TRANSCRIBER

5       I certify that the foregoing transcript of proceedings was

6    prepared from an FTR Gold audio recording of proceedings in the

7    above-entitled matter and was produced to the best of my

8    ability.   Inaudible indications in the transcript indicate that

9    the audio captured was not clear enough for this transcriber to

10   attest to its accuracy.

11

12                                    _____/s/_____
                                      Anneliese J. Thomson
13

14

15

16

17

18

19

20

21

22

23

24

25